Eddie Willie TAYLOR, et al., Plaintiffs,

v.

STATE OF ARIZONA; Terry Stewart, Director of the Arizona Department of Corrections; et al., Defendants.

No. CIV 72–21 PHX RCB.

United States District Court, D. Arizona.

March 21, 1997.

---

## ORDER

BROOMFIELD, Chief Judge.

Pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626, Defendants moved for immediate termination of a 1972 consent decree entered in this case. Plaintiffs opposed the motion on the basis that the PLRA is unconstitutional. On December 2, 1996, the court heard arguments from the parties, the United States, appearing as intervenor,[1] and the Constitutional Defense Council ("CDC"),[2] appearing as amicus curiae, on December 2, 1996. During the hearing, the court granted Defendants' motion to terminate the consent decree, but it stayed the order pending a determination of the PLRA's constitutionality. The court now rules.

The question before the court is: Can Congress, by subsequent legislation, alter the terms of a final judgment vindicating consti-

---

1. The United States had a right to intervene in this case pursuant to 28 U.S.C. § 2403(a), which provides in part that:

   In any action, suit, proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein the constitutionality of any Act of Congress affecting the public interest is drawn into question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene ... on the question of constitutionality.

2. The Arizona Legislature created the CDC and empowered it to pursue legal actions "in the name of this state." A.R.S. § 41–401(F). The

Attorney General (representing Defendants in this case) have challenged the constitutionality of the CDC. It argues that the legislature's grant of authority to the CDC to undertake litigation outside the direction of the Attorney General violates the separation of legislative and executive powers required by the Arizona Constitution. This constitutional question is currently before the Arizona Supreme Court. On November 19, 1996, the Arizona Supreme Court heard arguments as to this issue. As of December 2, 1996, the date of the oral arguments in this case, the Arizona Supreme Court had not yet ruled on the issue. Therefore, the court permitted CDC to participate in oral arguments.

tutionally protected rights entered by the court upon the express, formal agreement and consent of the parties, one of whom is a governmental agency? While close, the court concludes that it cannot. That the judicially sanctioned decree upholding these constitutionally agreed upon protections may be modified by prior congressional action (e.g. Federal Rule of Civil Procedure 60(b)(5)) does not permit a subsequent congressionally mandated procedure to alter or terminate the decree, for to do so violates the separation of powers.

## I. BACKGROUND

### A. CONSENT DECREE

In 1972, two inmates of the Arizona State Prison in Florence, Arizona, Eddie Taylor[3] and George Yanich, Jr.,[4] filed class action complaints against Defendants. These cases were later consolidated. The consolidated amended complaint asserted the Defendants had violated the First, Eighth, and Fourteenth Amendments by adopting and enforcing unconstitutional disciplinary rules; denying prisoners procedural due process; unlawfully depriving prisoners of good time credits; and subjecting prisoners who were placed in isolation to inadequate diets and degrading living conditions. [dkt. 21].

Before evidentiary hearings had ended, Defendants' predecessors in office entered into a consent decree with Plaintiffs. The decree provided for the adoption of new substantive and procedural rules of discipline and the restoration of good-time credits. Because the parties entered into the decree, evidentiary hearings were not completed. Accordingly, the judge then assigned to the case determined that it was inappropriate to make findings of fact or conclusions of law.[5]

**3.** In his complaint, Taylor alleges that Defendants brutally beat him, confined him in isolation without a hearing, denied him meals, and deprived him of two-for-one good time credits.

**4.** In his complaint, Yanich alleges that Defendants confined him in isolation without a hearing, punished him pursuant to disciplinary rules violating the First Amendment, and denied him food, water and light for a two day period. When Defendants eventually granted him a hearing, Yanich alleges that they denied him advance notice of the hearing, written notice of the evidence against him, an opportunity to prepare a

Specifically, he "indicate[d] no opinion as to the constitutionality of the prior rules and regulations either as written or as applied." [dkt. 52].

### B. PROCEDURAL HISTORY

Unfortunately, the consent decree did not end the dispute between the parties. The following summary outlines the procedural problems which have plagued this case after that decree. On January 6, 1994, Defendants filed a motion for modification of consent decree, contending that changes in the law and factual circumstances warranted modifying the decree. Defendants served the motion on a lawyer who was no longer Plaintiffs' counsel of record. In an order dated February 24, 1994, the then assigned judge granted that motion.

On January 18, 1995, inmates Mark Raymond Klein and Rick Alton Foley—who are not named parties in this case—filed a motion to vacate the prior order due to "fraud upon the court;" they alleged that they were not given notice of the motion to modify the consent decree. On March 1, 1995, without resolving the pending motion to vacate his February 24, 1994 decree, the then assigned judge entered an order transferring the case to the undersigned judge. On March 21, 1995, inmate Klein filed a "Motion to Intervene" and a "Request for Preliminary and Permanent Injunction." In June, 1996, Klein and Foley filed a "Notice of Pending Motion" and a "Motion by 299 Inmates to Vacate Document 99 [the February 24, 1994 Order] Due to Fraud Upon the Court and Due to Failure to Give Inmates Notice." Defendants did not respond to any of these motions even though it appeared that they were served with them.

defense, counsel, an opportunity to confront witnesses, and an appeal to a higher authority.

**5.** In his December 22, 1972 order, the then assigned judge stated:

Twice evidentiary hearings were commenced. Each time the hearings were adjourned prior to completion due to compromise, agreement or stipulation of counsel making further testimony unnecessary. Because of the agreements of counsel which prevented a full trial of all issues, *findings of fact and conclusions of law are not appropriate.*
[Dkt. 52] (emphasis added).

In an order dated July 30, 1996, the court directed Defendants to respond to the motions by August 9, 1996. On August 4, 1996, the CDC, purporting to appear on behalf of the State of Arizona, filed a motion to terminate the consent decree pursuant to the PLRA. On August 14, 1996, Defendants objected to the appearance of the CDC and moved to strike its motions; Defendants, however, did not respond to Klein and Foley's motions by August 9, 1996, or at all. Accordingly, in an order dated August 16, 1996, the court again directed Defendants to respond to the pending motions by September 4, 1996. The court further denied without prejudice CDC's motions since it had not properly appeared in the case pursuant to Local Rule 1.7(a). The court, however, later permitted the CDC to appear as amicus.

Defendants eventually filed a motion to terminate the consent decree pursuant to the PLRA. Thereafter, the court appointed counsel for the plaintiff class and denied without prejudice the motions filed by inmates Klein and Foley. Counsel for the plaintiff class responded to Defendants' motion to terminate, arguing that the PLRA was unconstitu-

tional; he further moved to vacate the February 24, 1994 order because of Defendants' failure to give notice. After the motions were fully briefed, an oral hearing was held on December 2, 1996.[6] In that hearing, the court granted Defendants' motion to terminate the consent decree pursuant to the PLRA since Plaintiffs conceded they could not provide the findings required by the PLRA. The court, however, stayed that order pending a determination of whether the PLRA was constitutional. The court now addresses this issue.

## C. PLRA

Congress passed the PLRA because it perceived that federal courts had usurped the authority of states to control their own prisons, and, further, that federal courts had usurped this authority to give prisoners greater rights than they were entitled to under the Constitution or any law.[7] Through the PLRA, states may move to terminate injunctions which provide for relief greater than that required by the Constitution or federal law:

(2) Immediate termination of prospective relief.—In any civil action with respect to

---

**6.** A few days before the hearing, the court received the United States' motion to intervene and its motion on the constitutionality of the PLRA. Plaintiffs received a copy of these motions on the day of the hearing. During the hearing, even though the United States did not provide an adequate reason for its delay in filing its motions and even though Plaintiffs' counsel averred that the United States was given notice of this action several weeks in advance, the court granted its motion to intervene. While the defendants did not object to the intervention of the Unites States, surprisingly it did object to the granting of additional time to Plaintiffs in order to respond to the United States' argument in support of the PLRA's constitutionality. Notwithstanding, because due process required no less, the court gave Plaintiffs and Defendants an opportunity to respond to the United States' motion on the constitutionality of the PLRA.

**7.** During the Senate hearings, Senator Dole explained that the PLRA was intended to prevent the federal courts' perceived micro-management of state and local prison systems:

[The PLRA] will work to restrain liberal Federal judges who see violations of constitutional rights in every prisoner complaint and who have used these complaints to micromanage State and local prison systems.

141 Cong. Rec. §§ 14413–14 (daily ed. Sept. 27, 1995). Senator Abraham indicated that the management of such prisons should be returned to states and municipalities who bear the financial burden of running these prisons:

The legislation I am introducing today will return sanity and State control to our prison systems. It will do so by limiting judicial remedies in prison cases and by limiting frivolous prison litigation.

\*     \*     \*     \*     \*     \*

People deserve to keep their tax dollars or have them spent on projects they approve. They deserve better than to have their money spent, on keeping prisoners in conditions some Federal judges feel are desirable, although not required by any provision of the Constitution or any law.

*Hearings on Prison Reform Before the Senate Comm. on the Judiciary*, 104th Cong. 1st Sess. (July 27, 1995) [hereinafter Senate Hearings]. Senator Hutchinson indicated that the PLRA would prevent the federal courts' perceived mollycoddling of prisoners at the expense of victims' interests:

Prisons exist for the protection of society—not for the comfort and convenience of criminals. Interference by federal courts has put the interests of criminals ahead of the interests of victims and law-abiding citizens.

*Id.*

prison conditions, a defendant or intervener shall be entitled to immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of a Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(b)(2). This provision applies to consent decrees even if they are, by definition, entered into voluntarily and even if they are entered into before the enactment of the PLRA. 18 U.S.C. § 3626(b)(3). The PLRA, however, provides an exception to immediate termination where there exists a "current or ongoing violation of the Federal right." [8] 18 U.S.C. § 3626(b)(3).

## II. DISCUSSION

### A. MOTION TO DECLARE PLRA UNCONSTITUTIONAL

Plaintiffs concede that Defendants would be entitled to a termination of the consent decree under § 3626(b)(2), since the previously assigned judge never found—understandably in light of the extensive negotiations between the parties which culminated in the consent decree—that there was a violation of a federal right, that the decree was narrowly drawn, and that the decree was the least intrusive means necessary to correct the violation of a federal right.[9] Instead, Plaintiffs argue that they should prevail since § 3626(b)(2) is unconstitutional;[10] they contend that PLRA violates (1) the separation of powers and (2) the due process clause.

### 1. SEPARATION OF POWERS

■ Plaintiffs argue that the retroactive application of the PLRA violates the separation of powers in that it mandates the reopening of final judgments.[11] The principle that Congress violates the separation of powers when it reopens final judgments is well-settled. See *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). The principle rests on the belief that Article III has invested the judiciary with the power to "say what the law is" in particu-

---

**8.** In full, § 3626(b)(3) provides:

Limitation.—Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current or ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

**9.** In fact, as Plaintiffs correctly note, it is unlikely that any plaintiff could effectively challenge a defendant's move to terminate since the findings required by the PLRA are unlikely to exist in the record for several reasons. First, parties enter into consent decrees precisely because they seek to avoid the uncertainty associated with such judicial findings. See *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 389, 112 S.Ct. 748, 762–63, 116 L.Ed.2d 867 (1992). Second, courts were unlikely to make such findings since they were under no obligation to do so nor could they have envisaged a subsequent legislatively-required set of findings such as the PLRA requires. Prior to the PLRA, the court could approve a consent decree as long as the decree came within the general scope of the pleadings and furthered the objectives of the law upon which the complaint was based. *Local Number 93 v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3076–77, 92 L.Ed.2d 405 (1986). There was no reason to conduct a "narrow tailoring" or "least intrusive" analysis because parties were free to agree to more relief than that required by law.

*Id.* Third and as in the case here, it was impossible for courts to make such findings when the consent decree was entered into before the end of all evidentiary hearings. Finally, as to the "exception" provision, findings of a "current or ongoing violation" are unlikely to occur precisely because the decree is in place.

**10.** Plaintiffs have also argued that the automatic stay provision of the PLRA is unconstitutional. This provision states that, if the court does not rule on a motion to terminate prospective relief within thirty (30) days after its filing, the prospective relief will be automatically stayed. 18 U.S.C. § 3626(e)(2). Since the court has ruled on the motion within the thirty day period, it need not and will not reach the issue of whether the stay provision is unconstitutional.

**11.** Defendants and the United States have sought to rebut two arguments which they contend Plaintiffs could have, but did not, raise under the separation of powers doctrine: (1) PLRA unconstitutionally prescribes a rule of decision without changing the underlying substantive law, *see United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), and (2) the PLRA unconstitutionally restricts the remedial jurisdiction of the district courts, see U.S. Const. Art. III § 1. (Def. Rep. III.A.3. & III.C.). Because Plaintiffs raised neither arguments, the court will neither consider nor rule on the validity of Defendants and the United States' rebuttals to these arguments.

lar cases and controversies. *Id.* at 218–20, 115 S.Ct. at 1453 (quoting *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803)). Moreover, the judiciary's power is "not merely to rule on cases, but to decide them ... with an understanding, in short, that a judgment conclusively resolves the case because a judicial power is one to render dispositive judgments." *Id.* (internal quotations and citations omitted) (emphasis in original). While the parties do not dispute this principle, they do dispute (1) whether PLRA is a retroactive law and (2) whether a consent decree is a final judgment for separation-of-powers purposes.

(a) Retroactive Legislation

As the CDC correctly notes, Congress can only re-open a final judgment through retroactive legislation. In *Plaut,* the Supreme Court held that "when *retroactive legislation* requires its own application in a case already finally adjudicated, it does no more and no less than reverse a determination once made in a particular case." *Id.* at 225, 115 S.Ct. at 1456 (quoting The Federalist No. 81, p. 545 (J. Cooke ed. 1961)) (emphasis added).

However, the court disagrees with CDC's contention that the PLRA is not retroactive. On its face, the PLRA is clearly retroactive since it applies to consent decrees approved *before* the enactment of the PLRA. *See* 18 U.S.C. § 3626(b)(2) ("[The Act] shall apply with respect to all prospective relief whether such relief was originally granted or ap-

proved before, on, or after the date of the enactment of this title."). *See also Plaut,* 514 U.S. at 224–26, 115 S.Ct. at 1456 ("[R]etroactive legislation ... [is] legislation that prescribes what the law was at an earlier time, when the act whose effect is controlled by the legislation occurred."); *Hadix v. Johnson,* 947 F.Supp. 1100, 1110 (E.D.Mich. 1996) (Feikens) (finding that the termination provision of the PLRA is "indisputably retroactive" under *Plaut*). Furthermore, the PLRA has clear retroactive effects since it "attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Products,* 511 U.S. 244, 269, 280–81, 114 S.Ct. 1483, 1499, 1505, 128 L.Ed.2d 229 (1994). Before the PLRA, courts could approve decrees which provided for relief greater than that required by law. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 389, 112 S.Ct. 748, 762–63, 116 L.Ed.2d 867 (1992). Under the PLRA, courts must terminate such decrees since the Act requires a finding of a federal right violation.[12]

(b) Final Judgment

█ As to whether a consent decree is a final judgment for separation of powers purposes, Plaintiffs contend that the Supreme Court's holding in *Rufo* resolves the dispute. Therein, the Supreme Court held that "a consent decree is a final judgment that may be reopened only to the extent that equity requires." [13] *Id.* at 391, 112 S.Ct. at 764

---

**12.** The CDC also argues that statutes, like the PLRA, which affect forward looking injunctions do not operate retroactively. As support it cites to dicta in *Landgraf* which states "when the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." 511 U.S. at 273, 114 S.Ct. at 1501. *See also Plyler v. Moore,* 100 F.3d 365, 375 (4th Cir.1996).

Both the CDC and the *Plyler* court, however, have taken this quotation out of context. *Landgraf* set forth a two step analysis for determining whether a court should apply a statute retroactively. First, where Congress has expressly prescribed that a statute should be applied retroactively, then the court must so apply. 511 U.S. at 280–81, 114 S.Ct. at 1505. Second, if the statute is silent, then the court must resort to default rules; the default rules require the court to determine whether the new statute would have improper retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or

impose new duties with respect to transactions already completed. *Id.* If the statute has retroactive effect, then the court will not apply it retroactively absent clear congressional intent. *Id.*

The quotation to which CDC and the *Plyler* court cite appears in the portion of the *Landgraf* decision dealing with the second prong of the test (the default rules). In this case, however, the court need not reach the second prong because the PLRA expressly provides for its retroactive application, i.e., application to consent decrees entered into prior to its enactment. Furthermore, read in context, the quotation cited to by CDC and *Plyler* does not mean that a statute which authorizes or affects the propriety of prospective relief entered into prior to the enactment of the statute is not retroactive; rather, the quotation means that applying such a statute does not have an *improper* retroactive effect.

**13.** *See also Stone v. City and County of San Francisco,* 968 F.2d 850, 854 (9th Cir.1992) ("A

While Plaintiffs emphasize the first part of this statement, that consent decrees are final judgments, the CDC and the United States emphasize the last part of this statement, that consent decrees can be reopened.

■ The court agrees with Plaintiffs. The CDC correctly notes that consent decrees are subject to "ongoing exercises of judicial authority;" specifically, courts may modify consent decrees in three situations: (1) "when changed factual conditions make compliance with the decree substantially more onerous;" (2) "when a decree proves to be unworkable because of unforeseen obstacles;" or (3) "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384, 112 S.Ct. at 760 (interpreting Rule 60(b) in the context of prison reform cases).

Nevertheless, as Plaintiffs argue, the fact that *courts* may reopen consent decrees under the above equitable standards does not mean that *Congress* can re-open such decrees. In *Plaut*, the Supreme Court held that "Rule 60(b), which authorizes discretionary judicial revision of judgments ... does *not* impose any legislative mandate-to-reopen upon the courts, but merely reflects and confirms the courts' own inherent and discretionary power ... to set aside a judgment whose enforcement would work inequity." 514 U.S. at 234, 115 S.Ct. at 1460 (emphasis added). The *Plaut* court further stated that, to the extent the law in existence at the time of the judgment permits reopening of the judgment for certain reasons, that limitation is "built into the judgment itself, and its finality is so conditioned." *Id.* However, where "Congress subjects the judgment to a reopening requirement which did not exist when the judgment was pronounced," it violates the separation of powers. *Id.* Here, the PLRA subjects the parties' consent decree to a reopening requirement which did not exist at the time the parties entered into the decree.[14]

■ Moreover, contrary to Defendants and CDC's argument, there is no distinction between finality for appeal purposes and finality for separation of powers purposes. In *Plaut*, the Supreme Court stated:

[A] distinction between judgments from which all appeals have been foregone or completed, and judgments that remain on appeal (or subject to being appealed), is implicit in what Article III creates: not a batch of unconnected courts, but a judicial department composed of "inferior courts" and "one supreme Court." Within that hierarchy, the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole. It is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must "decide according to existing laws." *Having achieved finality, however, a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was.*

*Id.* at 226–28, 115 S.Ct. at 1457 (citations omitted) (emphasis added). Thus, *Plaut* defined final judgments as judgments wherein the right to appeal has been exhausted, waived or elapsed. *See United States v.*

consent decree is considered a final judgment despite the fact that the district court retains jurisdiction over the case.")

**14.** The United States argues that the PLRA merely codifies "well-established standards articulated by the Supreme Court regarding the scope of remedies that lower federal courts may order or approve as a remedy for constitutional violations." In effect, the United States argues that the PLRA is a reopening requirement that existed at the time Plaintiffs and Defendants entered into their consent decree. The court disagrees.

The United States' argument ignores the Supreme Court's holding in *Rufo*. Therein, the Court held that courts are not to rewrite the decrees so that they conform to the constitutional floor. *Rufo*, 502 U.S. at 391–93, 112 S.Ct. at 764. By contrast, the PLRA makes consent decrees subject to the constitutional floor by requiring the finding of a current or ongoing violation of federal right. *See Hadix*, 947 F.Supp. 1100, 1104–05 (noting that the PLRA "completely rewrites the standard for modification in prison litigation, making consent decrees subject to the constitutional floor in direct contrast to *Rufo* ").

*Michigan,* File No. 1:84 CV 63 at 13 (W.D.Mich. July 3, 1996).

(c) *Wheeling* exception

*Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), establishes an exception to the general rule that Congress may not reopen final judgments. In *Wheeling,* the Supreme Court awarded damages and issued an injunction mandating that a bridge across the Ohio River either be removed or raised because it obstructed the free navigation of the river. Thereafter, Congress passed a statute that specifically stated the bridge at issue was lawful. After the bridge was destroyed in a storm, Pennsylvania sought to enjoin its reconstruction, but the Court dissolved the initial injunction based on the new statute. In so doing, the Court stated:

> In both cases, the private right to damages, or to the removal, arises out of the unlawful interference with the enjoyment of the public right, which, as we have seen, is under the regulation of congress. Now, we agree, if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court. The decree before us, so far as it respects the costs adjudged, stands upon the same principles, and is unaffected by the subsequent law. But the part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only removal of the bridge, but enjoins the defendants against any reconstruction or continuance ... If in the mean time since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is plain the decree of the court cannot be enforced. There is no longer any interference with the enjoyment of the public right inconsistent with the law.

*Id.* at 431–32. The *Wheeling* court, therefore, distinguished not only between the type of relief sought (money damages versus injunction), but also between the source of the right underlying the injunction (public versus private right). Thus, *Wheeling,* as Plaintiffs argue, properly stands for the proposition that an injunction is vulnerable to retroactive legislation only to the extent that it is based on "public rights common to all."

■ The CDC argues that, even if Plaintiffs are correct in asserting the public/private right distinction, Defendants nevertheless must prevail because constitutional rights are public rights; they "inhere not in any particular individual, but in all—that is why the case was necessarily brought as a class action." The court disagrees. Constitutional rights inhere to the individual and, as such, they are the very antithesis of public rights. They protect individual liberties even if such liberties may, in certain cases, conflict with the public's interests. The fact that similarly situated persons have asserted that their constitutional rights have been violated in a similar fashion does not transform what were private rights into public rights.

The CDC also argues that PLRA is aimed at the vindication of public rights—to limit federal judicial involvement in the management of prison systems. The court disagrees. The focus under *Wheeling* is the source of the rights underlying the judgment, not the source of the rights sought to be protected by the legislative amendment.

■ Finally, the CDC argues that the PLRA does not interfere with any vindication of constitutional rights since, by its terms, it requires only that injunctions be narrowly tailored to curing identified and ongoing constitutional violations. *See also Plyler v. Moore,* 100 F.3d 365, 372–73 (4th Cir.1996) (arguing that the PLRA does not seek to change the Eighth Amendment but rather the authority of district courts to approve relief greater than that required by the Eighth Amendment); *Jensen v. County of Lake,* 958 F.Supp. 397, 402–03 (N.D.Ind. 1997) (same). This argument confuses the proper inquiry under separations of powers analysis. The separation of powers is concerned with Congressional encroachment on judicial power, not that such encroachment will lead to a violation of the rights underlying the judgment. The *Plaut* court stated this point as follows:

> [T]he doctrine of separation of powers is a structural safeguard rather than a remedy

to be applied only when a specific harm, or risk of specific harm, can be identified. 514 U.S. at 237–39, 115 S.Ct. at 1462.

Therefore, because the rights implicated here are private constitutional rights, *Wheeling* does not apply.[15]

Supreme court cases subsequent to *Wheeling* have recognized the distinction between public and private rights. In *Sys. Fed'n v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961), the Court held that a district court abused its discretion when it refused to modify a consent decree based on an amendment to the underlying law. When the consent decree in *Wright* was entered into, union shop agreements were prohibited by the Railway Labor Act. Subsequently, however, Congress amended the Act to permit such agreements. The Court held that this change warranted a modification because a court

> must be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives. *In short, it was the Railway Labor Act, and only incidentally the parties, that the District Court served in entering the consent decree now before us.* The court must be free to continue to further the objectives of the Act when its provisions are amended. The parties have no power to require continuing enforcement of rights the statute no longer gives.

*Id.* at 651, 81 S.Ct. at 373 (emphasis added).

In *Hodges v. Snyder*, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923), resident taxpayers filed a complaint challenging the validity of a consolidated school district and seeking to enjoin officers of the district. The Supreme Court held that the attempted organization was not authorized by any law and remanded the case in accordance with its holding. The legislature, thereafter, passed a curative act validating all proceedings relating to the organization of the district. In upholding the constitutionality of the act, the Court stated:

> It is true that ... the private right of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation, but must be thereafter enforced by the court regardless of such legislation.

> This rule, however, as held in the *Wheeling Bridge* Case, does not apply to a suit brought for the enforcement of a public right which, even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced; although, in so far as a private right has been incidentally established by such judgment, as for special damages to the plaintiff or for his costs, it may not be thus taken away.

*Id.* at 603–604, 43 S.Ct. at 436–37 (internal citations omitted).

Other lower courts have also adopted this interpretation of *Wheeling. See, e.g., Johnston v. Cigna Corp.*, 14 F.3d 486, 492 (10th Cir.), *cert. denied*, 514 U.S. 1082, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995) ("In both [*Wheeling* and *Hodges*] ... the rights involved were public rights—as opposed to the private rights asserted here—and a judgment declaring a public right may be annulled by subsequent legislation."); *Daylo v. Adm'r of Veterans' Affairs*, 501 F.2d 811 (1974) ("The judgment was vulnerable to retroactive legislation only to the extent that the remedy chosen—an injunctive decree rather than damages at law—directly affected public rights"). Indeed, two lower courts, applying this interpretation of *Wheeling*, have found the PLRA unconstitutional. *Watson v. Ray*, No. 4–78–CV 80106 (S.D.Iowa February 10, 1997) (striking down the termination provision); *Hazen v. Reagan*, No. 4–75–CV–80201 (S.D.Iowa Dec. 2, 1996) (striking down the termination provision);[16] *Gavin v. Ray*,

---

**15.** Alternatively, the court notes that *Wheeling* could be read as creating an exception only for injunctions based on statutory rights as opposed to constitutional rights. As the Supreme Court indicated in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83–84, 102 S.Ct. 2858, 2877–78, 73 L.Ed.2d 598 (1982), the distinction between constitutional and statutory rights has meaning in the context of a separation of powers analysis. *See infra* at 1248–1249.

**16.** In finding the termination provision unconstitutional, both *Watson* and *Hazen* relied on the reasoning in *Gavin* which in turn relied on an interpretation of *Wheeling* as distinguishing between public and private rights.

1996 WL 622556 at *7 (S.D.Iowa Sept. 18, 1996) (striking down the termination provision); *United States v. Michigan*, No. 1:84 CV 63, at 14 (W.D.Mich. July 3, 1996) (striking down the stay provision); *Hadix v. Johnson*, 933 F.Supp. 1362, 1367–68 (W.D.Mich. 1996) (Enslen) (striking down the stay provision).[17]

By contrast, in *Plyler v. Moore*, the Fourth Circuit rejected this interpretation of *Wheeling*. The *Plyler* court found that the PLRA did not violate the separation of powers by reopening final judgments since consent decrees are not final judgments for separation of powers purposes. 100 F.3d at 371. Without much analysis, the Fourth Circuit interpreted *Wheeling* as distinguishing only between money judgments, which are immune to subsequent changes in the law, and injunctions, which are not. *Id.*

A lengthier explanation of why *Wheeling* should be read as distinguishing only between the character of relief sought (money damages vs. injunctions), as opposed to the source of the right underlying the judgment (public vs. private), can be found in *Benjamin v. Jacobson*, 935 F.Supp. 332 (S.D.N.Y. 1996). Therein, the District Court for the Southern District of New York held that the PLRA did not violate the separation of powers. In reaching its holding, it read *Wheeling* as allowing Congress to modify all prospective injunctions, regardless of whether they were based on public or private rights:

> Plaintiffs' argument that the source of the underlying right is an essential element of the separation-of-powers analysis must be rejected because the doctrine of separation of powers is concerned with the structural allocation of power in the Constitution, rather than the individual claims in a particular action ... The doctrine is a structural safeguard that focuses on the relative power of the courts. Article III invests

the courts "to say what the law is" ... and conclusively to decide cases free from legislative review of final judgments. Only the character of the relief awarded is relevant to the separation of powers inquiry because only that factor, and not the source of the underlying right, implicates the power and jurisdiction of the courts.

\* \* \* \* \* \*

> ... Had [Wheeling] rested on the fact that public rights as defined by the plaintiffs, i.e. rights created under the plenary authority of congressional enactment, been involved, both the damages and the injunction would have been vulnerable. Thus the crucial distinction for separation-of-powers purposes is the character of the relief, not the character of the complaint.

*Id.* at 348 (internal citations omitted).

The court disagrees with the *Benjamin* court's holding for several reasons. First, the Supreme Court has recognized that the type of right involved in a case has meaning for separation of powers purposes. In *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83–84, 102 S.Ct. 2858, 2877–78, 73 L.Ed.2d 598 (1982), the Court stated:

> [There is] a critical difference between rights created by federal statute and rights recognized by the Constitution ... [S]uch a distinction seems to us to be necessary in light of the delicate accommodations required by the principle of separation of powers reflected in Art. III. The constitutional system of checks and balances is designed to guard against "encroachment or aggrandizement" by Congress at the expense of the other branches of government. But when Congress creates a statutory right, it clearly has the discretion to, in defining that right to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that

---

**17.** Two other district court cases have found the PLRA unconstitutional. In *Ruiz v. Scott*, Civ. 78–987 (S.D.Tex. September 25, 1996), citing to *Hadix* and *Gavin*, the court found that the automatic stay provision violated separation of powers and due process of law. In *Hadix v. Johnson*, 947 F.Supp. 1100, 1996 WL 648417, the court found the termination provision violated separation of powers because it reopened final judgments; the court never reached the issue whether the *Wheeling* exception applied.

One district court avoided the constitutionality question altogether by finding that the defendants' failure to comply with a consent decree entered into prior to the enactment of the PLRA constituted a violation of a "federal right" and, thus, prevented immediate termination of the decree. *Gates v. Gomez*, Civ. S–87–1636 (E.D.Cal. July 22, 1996).

persons seeking to vindicate that right must do so before particularized tribunals ... No comparable justification exists, however, when the right being adjudicated is not of congressional creation. In such a situation, substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress' power to define rights that it has created. Rather, such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserved for Art. III courts.

*Id.* at 83–84, 102 S.Ct. at 2877–78.

Defendants contend that, because *Northern Pipeline* dealt with the power of Congress to grant Article III powers to legislative tribunals, and not with the power of Congress to reopen final judgments, it is irrelevant to the present case. The court disagrees. The above citation from *Northern Pipeline* speaks about the separation of powers, not only in the context of Congress's power to require persons to vindicate statutory rights before particularized tribunals, but also Congress's power to prescribe remedies for statutory as opposed to constitutional rights. Also, if Congress could not, without violating separation of powers, give non–Article III courts the power to decide constitutional issues, it seems to the court that Congress could not, without violating separation of powers, reopen final judgments based on such rights. The latter seems to be a more egregious exercise of Congressional power than the former.

Second, the *Benjamin* court contends that, if *Wheeling* in fact distinguished between public and private rights, both the injunction and the money damages would have been held vulnerable. This statement misconstrues Plaintiffs' argument.[18] Plaintiffs do not dispute that *Wheeling* did in fact distinguish between injunctions and money damages; rather, Plaintiffs argue that *Wheeling*

further distinguished between injunctions based on public/statutory rights and injunctions based on private/constitutional rights. Thus, under Plaintiffs' interpretation of *Wheeling,* money judgments, regardless of whether they are based on private or public rights, would not be subject to Congressional re-opening.

Finally, the court notes that the PLRA is precisely the type of legislation that is inimical to separation of powers. The *Plaut* court indicated that the Framers' sense of a sharp necessity to separate legislative from judicial power was prompted by the "vigorous, indeed often radical, populism of the revolutionary legislatures and assemblies [which] increased the frequency of legislative correction of judgments." 514 U.S. at 219, 115 S.Ct. at 1453-54. It further noted that the Framers lived at a time when "it was common for [ ] legislation not to prescribe a resolution of the dispute, but rather simply to set aside the judgment and order a new trial or appeal." *Id.* at 219, 115 S.Ct. at 1453. Here, the legislative history of the PLRA clearly illustrates Congressional intent to set aside judgments made by "liberal federal judges" based on the populist sentiment that courts are mollycoddling prisoners. Regardless of the validity of such a sentiment, it provides no basis for violating the separation of powers. As the *Plaut* court states, separation of powers is violated even if the legislature rescinds a final judgment "for the *very best* of reasons." *Id.* at 226–28, 115 S.Ct. at 1457.

Therefore, because the PLRA's termination provision (§ 3626(b)(2)) reopens final judgments and because it does not fall within the *Wheeling* exception, it is unconstitutional under separation of powers. Because the separation of powers is a sufficient basis to declare § 3626(b)(2) unconstitutional, the court will not consider whether the PLRA is unconstitutional under the due process clause.

18. The CDC similarly misconstrues Plaintiffs' argument when it argues that "plaintiffs' distinction cannot be squared with the holding of *Plaut* since the judgment affected by the legislation in that case arose from the vindication of a right created by federal statutory law—what plaintiffs deem to be a public right. If the Supreme Court had accepted plaintiffs' view, it necessarily would have *upheld* the subsequent Congressional

enactment because it simply altered a 'public right.' "

Plaintiffs' argument relies on a distinction between *injunctions* based on statutory rights versus those based on constitutional rights. Since *Plaut* did not involve an injunction, whether or not it involved a statutory or constitutional right becomes irrelevant for *Wheeling* purposes.

As a postscript, the court notes that its holding here does not mean that consent decrees will exist in perpetuity. Rather, it holds only that, to the extent such decrees should be modified because of changing circumstances, the judiciary, and not Congress, must so modify. That very option exists in this case and has been exercised by these very defendants.

## B. TERMINATION OF CONSENT DECREE

Even if the PLRA is unconstitutional, CDC has argued that Defendants are nevertheless entitled to a termination of the consent decree because (1) they complied in good faith and (2) there is no violation of a constitutional right.[19] The court disagrees.

In *Rufo*, the Supreme Court held that modification would be permitted only in three cases, see *supra*, none of which allow for modification based solely upon a finding of good faith compliance or a lack of constitutional violation.[20] As to the lack of constitutional violation, the *Rufo* Court explicitly rejected this as a basis for modifying a consent decree when it held "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." 502 U.S. at 391, 112 S.Ct. at 764.

The cases CDC cites to are inapposite to the present case. As to its argument that the decree should be terminated because of good faith compliance, CDC cites to several school desegregation cases, specifically *Bd. of Educ. of Oklahoma City v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). Therein, the Supreme Court held that, in deciding whether to dissolve a *court-imposed* desegregation decree, a court should address itself to whether the defendant had complied in good faith with the decree since it was entered and whether the vestiges of past

discrimination had been eliminated to the extent practicable. *Id.* at 249–50, 111 S.Ct. at 637–38. *Dowell* is inapposite because it deals with court-imposed, as opposed to consent, decrees. In the context of prison litigation cases, the Supreme Court has recognized a distinction between such decrees.[21] In *Rufo*, the Court held:

Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated. But we have no doubt that, to "save themselves the time, expense and inevitable risk of litigation," petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires ..., but also more than what a court would have ordered absent the settlement.

502 U.S. at 389, 112 S.Ct. at 762–63 (citations omitted).

The CDC contends that the school desegregation cases are applicable since "the Supreme Court has indicated that its statements in [such] cases as to the appropriate nature and scope of equitable remedies are fully applicable to Eighth Amendment prison litigation." Specifically, CDC points to *Lewis v. Casey*, —— U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), as citing school desegregation precedent for the proposition that remedies in institutional reform cases must be limited to the nature and scope of the constitutional violation. There is no dispute that school desegregation precedents have been cited to in prison litigation cases. Indeed, *Rufo* itself cites to *Dowell* for the proposition that "public interest and '[c]onsiderations based on the allocation of powers within our federal system' ... require that the district court defer to local government

---

**19.** The court notes that Defendants have neither raised this argument nor moved for a termination of the consent decree because of their good faith compliance.

**20.** Certainly, as Plaintiffs concede, the good faith conduct of the defendants may bear upon the result of the pending (January 6, 1994) motion for modification.

**21.** The CDC argues that the Supreme Court has not recognized a distinction between consent and

court-imposed decrees. Specifically, it cites to *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), a school desegregation case that applied the *Dowell* standard to a *consent decree*.

The court's holding today does not contradict *Freeman*. The Supreme Court may indeed have found no distinction between such decrees in the context of school desegregation cases. However, in *Rufo*, a case decided in the same term as *Freeman*, the Court found such a distinction in the context of prison reform cases.

administrators, who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform." 502 U.S. at 392, 112 S.Ct. at 764 (quoting *Dowell*, 498 U.S. at 248, 111 S.Ct. at 637). However, while *Dowell* deferred to the local school administrators through a standard based on good faith compliance, *Rufo* deferred to prison administrators under a standard that took into account "a change in conditions making it substantially more onerous to abide by the decree." *Id.* at 392, 112 S.Ct. at 764. The *Rufo* court, therefore, acknowledging the balance struck in *Dowell*, nevertheless, rejected it and struck its own balance in the context of prison reform cases.

As to its argument that an absence of ongoing violation warrants a termination of the decree, the CDC cites to several Ninth Circuit cases. The court finds that these cases are either inapposite or support the court's holding that a consent decree may remain in place notwithstanding the absence of an ongoing constitutional violation. In *Collins v. Thompson*, 8 F.3d 657 (9th Cir.), *cert. denied*, 511 U.S. 1127, 114 S.Ct. 2133, 128 L.Ed.2d 864 (1994), the consent decree required the state to reduce inmate population. The Ninth Circuit affirmed the district court's order vacating the decree, because the state had complied with both the decree and the Constitution. In *Washington v. Penwell*, 700 F.2d 570, 572 (1983), the consent decree required the state of Oregon to fund the Prisoners' Legal Services of Oregon (PLSO) to the extent "necessary to meet the Constitutional minimum of legal services needed for 'meaningful access to the courts.'" The Ninth Circuit held that the decree was void under contract law principles since the Attorney General lacked the authority to enter into a contract which would have bound the state. Moreover, the Ninth Circuit noted that the district court could not have entered an *involuntary* decree requiring state officials to do more than the minimum needed to conform with federal law. Id. at 574. Similarly, in *Toussaint v. McCarthy*, 926 F.2d 800 (9th Cir.1990), *cert. denied*, 502 U.S. 874, 112 S.Ct. 213, 116 L.Ed.2d 171 (1991), the dispute centered on a court order granting permanent injunctive relief, not a consent decree; therefore, *Toussaint* is inapposite.

Finally, both the CDC and Defendants have used the Supreme Court's holding in *Lewis* as a mantra throughout their briefs. However, *Lewis* is inapposite since it involves a court-imposed decree. The court further notes that its holding today does not contradict the rationale underlying the Supreme Court's decision in *Lewis*. Therein, the Court found that a district court order mandating systemwide changes in Arizona Department of Corrections' prison law libraries was improper because it failed to accord adequate deference to the judgment of prison authorities; such a deferential standard was necessary:

"if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."

—— U.S. at ——, 116 S.Ct. at 2185 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)). Here, prison administrators *voluntarily* entered into the 1972 consent decree; the court did not mandate that they enter into such a decree. Moreover, by denying their motion to terminate the decree *under the PLRA,* the court does not seriously hamper their ability to anticipate security problems nor their ability to adopt innovative solutions, since these administrators may always move, as they previously have, for modification of the decree under Rule 60(b)(5).

### C. MOTION TO DECLARE FEBRUARY, 1994 ORDER VOID

#### 1. BACKGROUND

■ On January 6, 1994, Defendants filed a motion for modification of consent decree, contending that changes in the law and factual circumstances warranted modifying the decree. [dkt. 99]. As a result of this motion, the previously assigned judge signed a form of order, drafted by Defendants, modifying the consent decree. [dkt. 100]. The order permitted Defendants to revise certain disciplinary rules.

Plaintiffs argue that the court should declare this order void since Defendants failed to serve Plaintiffs with their motion. Defendants contend, on the other hand, that they did attempt to serve Plaintiffs. The assistant attorney general (AG) served the motion on a lawyer who was allegedly shown in the state's file as counsel for the class. However, in an order filed on March 26, 1980, the previously assigned judge had relieved that lawyer of any further responsibility in the case. [Dkt. 97]. The AG alleges that neither the court nor Plaintiffs' former counsel informed him that counsel had been relieved of his responsibility. Defendants further contend that even if the AG had known that former counsel was no longer Plaintiffs' present counsel, it could not have served the motion for modification on anyone else since the addresses of the class representatives, Taylor and Yanich, cannot be found by the Arizona Department of Corrections.

## 2. DUE PROCESS

A fundamental and elementary requirement of due process in any proceeding is notice and opportunity to be heard. In *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the Supreme Court established the standard for determining whether a party's notice would meet due process scrutiny:

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections ... The notice must be of such nature as reasonably to convey the required information ..., and it must afford a reasonable time for those interested to make their appearance. But if with due regard for the particularities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied.

*Id.* at 314–15, 70 S.Ct. at 657.

Service of the motion on a Plaintiffs' counsel who was relieved from the case is *not* notice "reasonably calculated to apprise interested parties of the pendency of the action." The 1980 order clearly indicated that former counsel was no longer Plaintiffs' lawyer. Furthermore, even after giving due regard for the "particularities and peculiarities" of this case, those peculiarities do not alter the lack of notice to Plaintiffs. Indeed, when this court, sua sponte, discovered the lack of service, it cured it by the appointment of counsel. Accordingly, the court concludes that Defendants' failure to serve Plaintiffs resulted in a violation of Plaintiffs' due process rights. *See, e.g., Wetmore v. Karrick*, 205 U.S. 141, 27 S.Ct. 434, 51 L.Ed. 745 (1907) (holding that court cannot, consistent with due process, set aside judgment of dismissal and render a personal judgment against defendant without notice); *United States v. State of Colorado*, 937 F.2d 505, 509 (10th Cir.1991) (setting aside summary judgment where no notice was given to defendant); *Simer v. Rios*, 661 F.2d 655, 663 (7th Cir.), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982) (holding that entry of settlement decree without notice to putative class members violated the due process rights of the class members). *See also, In re Center Wholesale, Inc.*, 759 F.2d 1440, 1448–49 (9th Cir.1985) (holding that one-day notice provided to creditor before entry of cash collateral order violated due process).

A judgment entered in a manner inconsistent with due process is void. *In re Center Wholesale, Inc.*, 759 F.2d at 1448. Under Rule 60(b)(4), a court may set aside a void judgment. Therefore, the court grants Plaintiffs' motion to vacate the February 24, 1994 order granting Defendants' motion for modification.

By virtue of this order, the February 24, 1994 motion to modify the consent decree is now pending before this court. As a result, the court concludes that the orders presently entered do not constitute a final order for appeal purposes, and the court declines to make a Rule 54(b) finding.

IT IS ORDERED vacating the stay of the court's December 2, 1996 order (doc. 154).

IT IS FURTHER ORDERED vacating the court's December 2, 1996 order which granted Defendants' motion to terminate the consent decree (doc. 154).

IT IS FURTHER ORDERED denying Defendants' motion to terminate the 1972 consent decree (doc. 120).

IT IS FURTHER ORDERED granting Plaintiffs' motion to declare unconstitutional § 3626(b)(2) of the PLRA (doc. 134).

IT IS FURTHER ORDERED denying Plaintiffs' motion to declare unconstitutional § 3626(e)(2) of the PLRA (doc. 134).

IT IS FINALLY ORDERED granting Plaintiffs' motion to declare void the February 24, 1994 order (doc. 134). However, this order vacating the February 24, 1994 order is stayed, and the present grievance procedures should remain in effect, pending further order by the court or a resolution of the petition to modify the consent decree. Defendants have thirty (30) days from the date of this order to file, if they choose, an amended petition to modify or terminate the consent decree under Rule 60(b)(5) or a notice of election not to file an amended petition. Plaintiffs have thirty (30) days from the date of Defendants' filing of an amended petition or, alternatively, a notice of election not to file such an amended petition, whichever first occurs, to file a response to the amended petition or the original petition.