181 F.3d 1017 (9th Cir. 1999)
 EDDIE WILLIE TAYLOR; MICHAEL F.X. HOGAN, Plaintiffs-Appellees,
v.
UNITED STATES OF AMERICA, Intervenor-Appellant,
and
STATE OF ARIZONA; TERRY STEWART, Director of the Arizona Department of Corrections, et al., Defendants-Appellants.
Nos. 97-16069, 97-16071
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted: March 9, 1998
Decided: May 4, 1998
Rehearing En Banc Granted and Opinion Withdrawn: November 3, 1998
Argued and Submitted: January 21, 1999
Filed: June 18, 1999
 
 Darrin J. DeLange and Thomas J. Dennis, Assistant Attorneys General, Phoenix, Arizona, for the defendants-appellants.
 Robert M. Loeb, United States Department of Justice, Washington, D.C., for the intervenor-appellant.
 Randy Papetti, Lewis & Roca, Phoenix, Arizona, for the plaintiffs-appellees.
 Peter J. Siggins, Deputy Attorney General, San Francisco, California, for the amicus.
 Appeals from the United States District Court for the District of Arizona. Robert C. Broomfield, District Judge, Presiding. D.C. Nos. 72-00021-RCB, 72-00058-RCB.
 Before: Hug, Chief Judge, and Thompson, Fernandez, Rymer, Kleinfeld, Hawkins, Tashima, Thomas, Silverman, Graber, Wardlaw, Circuit Judges.
 Opinion by Judge Rymer; Concurrence by Judge Tashima; Dissent by Judge Wardlaw; Dissent by Judge Graber.
 RYMER, Circuit Judge:
 
 
 1
 The en banc worthy issue in this case is whether the "immediate termination" provision of the Prison Litigation Reform Act of 1995 (PLRA), 18 U.S.C. 3626(b)(2), runs afoul of separation of powers principles. However, we do not need to reach this question because the motion that is before us - "to terminate the consent decree entered in this case on December 22, 1972" - is moot because the December 22, 1972 order (regardless of its label) was interlocutory and disappeared when the final judgment was entered October 19, 1973. We therefore do not have to, and so should not, resolve the constitutionality of the "immediate termination" provision at this time.
 
 
 2
 But if this is wrong and Arizona is somehow entitled to proceed, then the constitutionality of 3626(b)(2) can only be decided in the context of the actual judgment that was entered in this action. That judgment could not be more final. It simply approves rules and restoration of individual good time credits that the parties agreed upon and that were basically in place; the judgment contains no ongoing, monitoring, reporting, enforcing, or oversight provisions. It does not look, walk or quack like an injunction. On several occasions the court explicitly disavowed any intention of trying prospectively to manage prison administration, and in its 1973 judgment the court did not retain jurisdiction for any purpose. Indeed, the judgment declares "that all relief sought by plaintiff members of the class heretofore designated to which they are entitled is granted by this Judgment and that the class, collectively and individually, is entitled to no other relief under this action." As such, the judgment ended this case. It cannot be that twenty-five years later, Congress may redefine "relief" in such a way that it retroactively converts a judgment which on its face ends an action into one that grants "prospective relief" such that it now must be reopened and terminated. Regardless of the constitutionality of applying 3626(b)(2) to pre-PLRA consent decrees that do put injunctions in place to govern prisons prospectively, applying the "automatic termination" provision to the Taylor judgment subjects it to reopening conditions that did not exist when it was entered. There is no opinion of which we are aware that would say this is not an unconstitutional incursion on judicial power.
 
 
 3
 We accordingly affirm denial of the motion to terminate the December 22, 1972 consent decree on the ground that it was moot, but under no circumstances would we reverse on the merits as the dissent indicates we should.
 
 
 4
 * In early 1972, two inmates at the Arizona State Prison in Florence, Arizona, Eddie W. Taylor and George Yanich, Jr. (collectively "Taylor"), petitioned the United States District Court for the District of Arizona for writs of habeas corpus under 28 U.S.C. 2254 and for damages under 42 U.S.C. 1983.[1] The two related cases were consolidated. In pertinent part, Taylor challenged on a class-wide basis Arizona's inmate behavior and discipline rules and procedures, and deprivation of "two-for-one good behavior time" (Count Three).[2] Taylor took discovery and the court conducted evidentiary hearings on May 26 and November 10, 1972. In the middle of the first hearing (on Taylor's motion for interlocutory relief pending trial), the parties stipulated that "the disciplinary procedures of the prison leave something to be desired to comply with constitutional standards," and agreed "to negotiate over proper disciplinary standards and procedures to the end of seeking agreement."[3] Settlement negotiations proceeded over the following months and, after additional briefing, the court held another hearing November 10 to discuss their progress. Approximately one month later, the parties lodged an agreement which the district court adopted in a Memorandum and Order filed December 22, 1972. Describing the background, the court observed:
 
 
 5
 These two class action cases were originally consolidated for trial and counsel was appointed to represent plaintiffs. Twice evidentiary hearings were commenced. Each time the hearings were adjourned prior to completion due to compromise, agreement or stipulation of counsel making further testimony unnecessary. Because of agreements of counsel which prevented a full trial of all issues, findings of fact and conclusions of law are not appropriate.
 
 The court then said of the stipulation:
 
 6
 The following order is in the form stipulated to by counsel for both sides and approved by the Court to dispose of Count 3, the class action attacking the constitutionality of the prison's disciplinary rules, regulations and conditions of special confinement. All the provisions of the following order were agreed upon by counsel for both sides in consultation with their named clients . . . . In view of the manner in which the case has arrived at this stage, the Court, at this time, indicates no opinion as to the constitutionality of the prior rules and regulations either as written or as applied.
 
 
 7
 The order outlined procedural and substantive rules for the administration of prison discipline that had been agreed upon by the parties; required the parties to prepare and submit revised rules within 90 days;[4] allowed Taylor to present exceptions; indicated that the court would "adjudicate any appropriate issues, and will declare the resultant rules as generally suitable for use and application until changed"; and "retained jurisdiction to review this procedure within six (6) months to determine that it is operating properly." It also provided for review of disciplinary records that would result in an order adjusting good time credits that would be res judicata as to the rights of the parties.
 
 
 8
 Over the next few months the parties completed their negotiations as contemplated in the December 22 Order. On July 25, 1973, Arizona prison officials submitted their final draft of the "Prisoner Rules, Regulations and Discipline Program of the Arizona State Prison," and Taylor simultaneously filed six objections to specific provisions of the proposed Rules. The court held a hearing on August 2, 1973 to resolve Taylor's objections, at the outset of which it observed, "the responsibility for drafting administrative rules is not on the Court. The Court's only function is to review rules that have been drafted by the administration, to determine whether they meet minimum constitutional standards and whether they are applied constitutionally, that is, evenly and fairly to everybody." On August 27, the court issued a Memorandum and Order denying all but one of Taylor's objections (requiring a hearing prior to revocation of probation that may result in loss of accrued good-time credits). In so doing, it stated:
 
 
 9
 It is recognized that it is neither the duty nor the prerogative of this Court to dictate rules and regulations for the prison. The Court's responsibility is only to insure that the disciplinary rules on their face and as applied provide minimal due process as required by the Constitution and that their provisions do not violate the constitutional prohibitions against cruel and unusual punishment. It is recognized that . . . persons may differ in their opinions as to the desirability, propriety or effect of different procedures or different standards of punishment, but the test to be applied by the Court is that of minimum constitutional compliance.
 
 
 10
 The order approved the "Prisoner Rules, Regulations and Discipline Program of the Arizona State Prison" Final Draft with the exception noted. Counsel were ordered to prepare a proposed amendment, and the court retained jurisdiction "as indicated in previous orders solely for consideration of objections, if any, to the appeals procedure as administered, for final settlement of two-for-one time restoration, and for consideration of the above-indicated amendment."
 
 
 11
 The parties filed a stipulation October 19, 1973 reflecting agreed changes to the Final Draft as well as the one ordered change, and the "final settlement" of two-for-one time restoration. On the same day, judgment was entered in Taylor's favor. The judgment recognizes that the "class herein includes all inmates who were and are serving sentences at the Arizona State Prison during the pendency of this action, as heretofore ordered by the Court and through the date of this judgment . . . ." It approves the Prisoner Rules, Regulations and Discipline Program attached as an exhibit and incorporated by reference. It directs the Arizona State Prison to adjust immediately the respective inmate release dates in accordance with the settlement of two-for-one time restoration stipulated by the parties. And the judgment provides "that all relief sought by plaintiff members of the class heretofore designated to which they are entitled is granted by this Judgment and that the class, collectively and individually, is entitled to no other relief under this action."
 
 
 12
 Taylor filed a "pro forma" motion for a new trial October 23, 1973 in order to give counsel an opportunity to inform the prisoners that a final judgment had been entered. It was denied November 6. No appeal was taken.
 
 
 13
 In November 1979, Arizona moved to modify the October 19, 1973 judgment pursuant to Fed. R. Civ. P. 60(b) to substitute new "Disciplinary Rules for the Arizona Department of Corrections" for the 1973 prison rules and regulations. The court found that the new rules "on their face [ ] meet minimal constitutional standards" and approved them. Arizona filed another motion pursuant to Rule 60(b)(5) on January 6, 1994, this time "for a modification of the consent decree entered in this matter in 1972" in order to permit the Prison System to adopt a new disciplinary system. This motion was summarily granted on February 24, 1994; however, two members of the class acting pro se moved on January 18, 1995 to vacate the February 24, 1994 order on the ground that they were not given notice of Arizona's motion. Judge Copple, to whom the matter had originally been assigned, recused himself and it was reassigned to Judge Broomfield, who on March 21, 1997 vacated the February 24, 1994 order on due process grounds but stayed that order pending consideration of Arizona's now-revived Rule 60(b)(5) motion.[5]
 
 
 14
 Meanwhile, on September 3, 1996 Arizona moved "to terminate the consent decree entered in this case on December 22, 1972, and modified by Order filed February 24, 1994, pursuant to Fed. R. Civ. P. 60(b) of Civil Procedure and 18 U.S.C. 3626(b), the Prison Litigation Reform Act."[6] The district court denied the September 3, 1996 motion to terminate, and granted Taylor's motion to declare 3626(b)(2) of the PLRA unconstitutional. See Taylor v. Arizona, 972 F. Supp. 1239, 1249 (D. Ariz. 1997). It is this ruling that Arizona (joined by the United States) appeals.
 
 II
 
 15
 Arizona argues that the PLRA's termination provision does not violate the separation of powers doctrine because, rather than retroactively reopening a final judgment, it merely establishes conditions for continuing prospective injunctive relief enforced against a state by a federal court. It maintains that the consent decree in this case is not "final" because it is subject to ongoing judicial monitoring and, when necessary, termination either by judicial or statutory authority. Because the decree is not final, Congress may restrict the prospective remedial jurisdiction of the federal courts.
 
 
 16
 Similarly, the United States points out that this case involves application of the PLRA's termination provisions to prospective relief, not to a money judgment, and argues a "final" prospective order does not represent "the last word of the judicial department with regard to a particular case or controversy." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 227, 131 L. Ed. 2d 328, 115 S. Ct. 1447 (1995). Since a court always possesses the power to revisit continuing prospective orders in light of the evolving factual or legal landscape, and to modify or terminate the relief, it does not offend separation of powers principles to require a court today, when deciding whether to continue, modify or terminate its prospective orders, to apply the standards set forth under current federal law - the PLRA. Further, according to the government, Congress has authority under Article I to regulate and restrict the injunctive powers of the federal courts unfettered by common law standards established by the Supreme Court for considering a request to modify or terminate a consent decree, see Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378, 116 L. Ed. 2d 867, 112 S. Ct. 748 (1992), and has properly exercised that power in the PLRA.
 
 
 17
 Taylor responds that a consent decree imposing prospective relief is a final judgment, see id. at 391; Congress may not subject final judgments to new reopening requirements, see Plaut, 514 U.S. at 234; and the PLRA fails separation of powers analysis to the extent it goes beyond merely setting standards to apply to judgments rendered in the future, seeking instead to reopen judgments already final and to condition their viability on new standards. He disagrees with Arizona and the United States that Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) 421, 15 L. Ed. 435 (1855) (Wheeling Bridge II) controls, since Congress has not altered the substantive law upon which the judgment in this case was based. In any event, Taylor contends, the fact that courts may reopen final judgments under the equitable standards in Rule 60(b) does not mean that Congress can impose a mandate to reopen for other reasons.
 
 
 18
 We see the issue somewhat differently from either party. They fix on the separation of powers impact of the PLRA on a "consent decree" supposedly entered December 22, 1972. However, the December 22, 1972 order is not the judgment. The judgment is what counts, and it neither refers to nor incorporates the December 22, 1972 order. Therefore, whether there is a separation of powers problem that we must confront and if so, the framework for its analysis, must start (and so far as we are concerned, also stop) with the October 19, 1973 judgment.
 
 
 19
 * There is no way to read the December 22, 1972 order as itself being a final order, independent of the judgment entered ten months later. On its face it contemplated further negotiations. While the court did retain jurisdiction, it did so only for six months and only for limited purposes while the parties continued to finalize their settlement.[7] Although Arizona refers to this order as a "consent decree," it doesn't look like one to us. Rather, it appears to be a case management order (reflecting the parties' stipulation) about how to proceed to dispose of Count Three. It summarizes agreements in principle about the new rules, sets deadlines for submitting revised rules, and establishes a process for making and resolving objections. Regardless, even if the December 22, 1972 order were a "consent decree," the judgment does not mention it. The judgment does specifically incorporate by reference - and attaches as exhibits - the Prisoner Rules, Regulations and Discipline Program, as well as the settlement of two-for-one time restoration and release dates for current inmates, but no other documents. Thus, the judgment itself leaves no doubt that the December 22, 1972 "consent decree" was not part of the relief that was granted. This makes sense, as the December 22, 1972 order was but a work in progress.
 
 
 20
 Arizona's motion under the PLRA to terminate the "consent decree" entered December 22, 1972 is accordingly moot.[8] There is no December 22, 1972 consent decree left to be terminated, for once judgment was entered, the December 22, 1972 interlocutory order (whatever its label) disappeared.[9] It was automatically terminated by the judgment. This means that the district court had no live motion before it. For this reason we affirm denial of Arizona's motion, albeit on different grounds from the district court's.
 
 
 21
 We recognize that this may seem futile, as Arizona can simply file another motion to terminate relief granted in the judgment, or even urge that its present motion be so construed. We nevertheless decline to do so, for two reasons. First, the arguments have proceeded on the assumption that the court made prospective orders and retained jurisdiction - which it did in the December 22, 1972 order but which it did not do in the final judgment. These arguments are largely beside the point in light of the actual judgment that was entered October 19, 1973. The second, related reason is the importance of avoiding a constitutional issue where possible. To uphold denial of Arizona's motion on mootness grounds obviously serves this salutary purpose.[10] In addition, the separation of powers issue is so serious in this particular case that the parties - and the decision with respect to it - must focus directly on the judgment. If this is done, the question becomes whether Congress may require a United States district court to reopen, reconsider and terminate a final judgment (which leaves nothing more for the district judge to do) under standards that were not in existence when the judgment was entered and became final.
 
 B
 
 22
 Although reluctant to do so, we now turn to that question because the dissent has addressed a different one, and it cannot be correct that the PLRA's "immediate termination" provision may constitutionally be applied to the Taylor judgment. The judgment itself leaves no doubt that it left nothing more for the district court to do. Its terms could not be clearer: "All relief sought by plaintiff members of the class heretofore designated to which they are entitled is granted by this Judgment and [ ] the class, collectively and individually, is entitled to no other relief under this action." Period.
 
 
 23
 The court did not retain jurisdiction, as it could have done. Nor does the judgment require Arizona to report on compliance, request permission to make changes, or return to court for any purpose, as it also could have done. Unlike cases where a consent decree does put an injunctive scheme in place and the court retains jurisdiction to enforce it, here the judgment explicitly granted all the relief to which Taylor was entitled. That relief does not include continuing jurisdiction. Indeed, so far as the record discloses, the rules were implemented and the credits were restored; the judgment, in short, was executed. The case is over.[11]
 
 
 24
 It is beyond dispute that the separation of powers principle forbids Congress from reopening the final judgments of Article III courts. See Plaut, 514 U.S. 211 at 240, 115 S. Ct. 1447, 131 L. Ed. 2d 328. As the Court explained in Plaut:
 
 
 25
 Article III establishes a "judicial department" with the "province and duty . . . to say what the law is" in particular cases and controversies. The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the article III hierarchy - with an understanding, in short, that "a judgment conclusively resolves the case" because "a 'judicial Power' is one to render dispositive judgments."
 
 
 26
 Id. at 218-19 (citations omitted). Inasmuch as "judicial jurisdiction implies the power to hear and determine a cause," United States v. O'Grady, 89 U.S. (22 Wall.) 641, 647, 22 L. Ed. 772 (1874), once court decisions achieve finality they "may not lawfully be revised, overturned or refused faith and credit by another Department of Government." Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113, 92 L. Ed. 568, 68 S. Ct. 431 (1948). Congress violates this fundamental principle by retroactively commanding the federal courts to reopen final judgments, which is precisely what Congress will have done if the PLRA's "immediate termination" provision is applied to the Taylor judgment.
 
 
 27
 In a nutshell, Congress may change the law and, in light of changes in the law or facts, a court may decide in its discretion to reopen and set aside a consent decree under Fed. R. Civ. P. 60(b), see Rufo, 502 U.S. at 383-84, or refuse to enforce an executory decree pursuant to its inherent power, see Wheeling Bridge II, 59 U.S. (18 How.) at 431-32, but Congress may not direct a court to do so with respect to a final judgment (whether or not based on consent) without running afoul of the separation of powers doctrine. See Plaut, 514 U.S. at 227, 234-35.
 
 
 28
 Congress in fact changed the law in 3626(a) so that "prospective relief" with respect to prison conditions shall now extend no further than necessary to correct violation of a federal right and may not be granted at all unless the court finds that the relief is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary to correct the violation.[12] Subsection (a) creates no problem in this case. Presumably under Rufo, a prison subject to injunctive relief could invite a court pursuant to Rule 60(b) to revisit a pre-PLRA consent decree on the basis of this change in law, and might prevail if it could show that continued enforcement was inequitable.[13] However, 3626(b)(2) mandates reopening and requires the immediate termination of "any prospective relief" that was approved or granted in the absence of the findings set out in (a)(1), whether before or after the PLRA's enactment, unless the court finds that the "prospective relief" remains necessary to correct an ongoing violation and extends no further than necessary, is narrowly drawn, and is the least intrusive means.[14] In addition, the Act defines "prospective relief" as "all relief other than compensatory monetary damages." 18 U.S.C. 3626(g)(7). Thus, the combined effect of 3626(b)(2) and (g)(7) is retroactively to make any judgment that does not award monetary damages "prospective relief" subject to immediate termination. Obviously the Taylor judgment awards no money damages, but it also left nothing for the court to do in the future. It simply approved credits that were res judicata and rules that were already in place (except for a reasonable time for printing and distribution of the substantive rules). It awarded no prospective equitable relief. Therefore, if somehow applied in this case, this legislation would both subject a final judgment "to a reopening requirement which did not exist when the judgment was pronounced," Plaut, 514 U.S. at 234, and direct reversal of a final determination of the Judicial Department. That Congress may not do. To our knowledge, no court has ever held otherwise.
 
 
 29
 In Wheeling Bridge II, the Court decided not to enforce an executory decree that directed removal of a bridge that had previously been found to constitute an obstruction to navigation, after Congress (which was the authority competent to say so) made the bridge a post-road and thus, by definition, not an unlawful obstruction. 59 U.S. at 430. The important thing about Wheeling Bridge II is that it was the Court that made this decision, exercising its discretion, not Congress that directed the court to reopen and terminate, applying newly enacted standards.
 
 
 30
 Other circuits that have considered the "immediate termination" provision of the PLRA and held it constitutional have done so in cases involving comprehensive consent decrees that subject prison administrators to ongoing court supervision and enforcement. See, e.g., Benjamin v. Jacobson, 172 F.3d 144, 149-50 (2d. Cir. 1999) (en banc) (complex series of consent decrees which "generated a judicially administered structure comprising over ninety related court orders and extending to more than thirty discrete areas of prison administration"); Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 182-82 (3d Cir. 1999) (district court retained jurisdiction over decree that governs nearly every aspect of prison management); Hadix v. Johnson, 133 F.3d 940, 941-42 (6th Cir.), cert. denied sub nom. Hadix v. McGinnis, 141 L. Ed. 2d 737, 524 U.S. 952, 118 S. Ct. 2368 (1998) (consent decree addressed various aspects of prison life, including safety, sanitation, hygiene, and protection from harm that resulted in several remedial orders over the years); Dougan v. Singletary, 129 F.3d 1424, 1425 (11th Cir. 1997), cert. denied, 141 L. Ed. 2d 743, 524 U.S. 956, 118 S. Ct. 2375 (1998) (highly detailed remedial order entered after court found prison officials in contempt for violating decree providing for exercise sessions); Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 653 (1st Cir. 1997), cert. denied, 141 L. Ed. 2d 735, 524 U.S. 951, 118 S. Ct. 2366 (1998) (1979 consent decree governed jail housing policies and inmate double-bunking under supervision of the court); Gavin v. Branstad, 122 F.3d 1081, 1083-84 (8th Cir. 1997), cert. denied, 141 L. Ed. 2d 741, 524 U.S. 955, 118 S. Ct. 2374 (1998) (court retained jurisdiction to enforce terms of decree that contained detailed regulations governing a number of areas of prison life, and ordered compliance with supplemental agreements over which it also retained jurisdiction); Plyler v. Moore, 100 F.3d 365, 369 (4th Cir. 1996), cert. denied, 520 U.S. 1277, 138 L. Ed. 2d 217, 117 S. Ct. 2460 (1997) (consent decree contained measures to be taken to alleviate overcrowding and detailed provisions relating to health services, educational programs, vocational training, food service, and visitation over which court retained jurisdiction "to ensure that the Decree and all plans incorporated herein are fully implemented"). Without expressing a view one way or the other on cases such as these, it is clear that application of the "immediate termination" provision to the Taylor judgment is altogether different.
 
 
 31
 In sum, borrowing from Plaut, we "know of no previous instance in which Congress has enacted retroactive legislation requiring an Article III court to set aside a final judgment, and for good reason. The Constitution's separation of legislative and judicial powers denies it the authority to do so." Plaut, 514 U.S. at 240.
 
 III
 
 32
 Because it is an act of Congress that is at stake on the one hand, but the integrity of a judgment and the independence of the judicial branch that is threatened on the other, we must be cautious in upholding, or overturning, the "immediate termination" provision of the PLRA. We do not have to decide the separation of powers question in this case, since Arizona's motion to terminate the December 22, 1972 consent decree is moot and was therefore properly denied. However, inasmuch as the dissent would uphold 3626(b)(2), we are also constrained to say we disagree that it can be constitutionally applied so as to require the district court to reopen and reconsider the Taylor judgment (which leaves nothing more for the district judge to do) under standards that were not in existence when the judgment was entered and became final.
 
 
 33
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Named as defendants were the State of Arizona; Walter G. Jacobs, Chairman of the Board of Pardons and Paroles; Allen Cook, Director of the Department of Corrections; Frank A. Eyman, Warden of the Arizona State Prison; A. G. Jiminez, a prison Guard Captain; and Solomon Madril and Pablo Lopez, two prison Correctional Officers.
 
 
 [2]
 The named plaintiffs changed over time, but for convenience we shall refer to the class throughout as Taylor.
 
 
 [3]
 This stipulation was read into the record during the May 26 hearing and subsequently memorialized in a June 2, 1972 Stipulation and Order. The parties also agreed to return Taylor to the general inmate population, restore his suspended two-for-one credits, and to sever Yanich's damages claim. Taylor and Yanich's remaining damages claims and a claim (also pled as a class action) pertaining to prison living conditions, were disposed of in the court's December 22, 1972 order.
 
 
 [4]
 This deadline was later extended to July 25, 1973.
 
 
 [5]
 This motion remains in abeyance, as no further substantive activity has occurred in the district court since this appeal was taken from the March 21, 1997 order that also held the "immediate termination" provision of the PLRA unconstitutional. In the March 21, 1997 order, the district court gave Arizona thirty days to file "an amended petition to modify or terminate the consent decree under Rule 60(b)(5) or a notice of election not to file an amended petition." The record reflects that Arizona filed a supplement to its 1994 motion, with additional authority, but has neither amended the petition to seek to terminate the decree nor filed an election not to. The fact that this motion to modify is still pending does not appear to moot or otherwise affect resolution of this appeal, having to do, as it does, with a motion to terminate under the PLRA. However, as discussed in n.10, infra, a motion pursuant to Rule 60(b) to terminate the "consent decree" (if there were one that is still alive), or for relief from the judgment, might have the effect of making it unnecessary to reach the separation of powers issue posed in this case.
 
 
 [6]
 On August 5, 1996 the Arizona Constitutional Defense Council (CDC) filed a motion in the name of the State of Arizona (as it was authorized by state law to do at the time) to terminate injunctive relief and dismiss the case. The Attorney General distanced himself from these papers, and eventually the Arizona Supreme Court ruled that the statute empowering the CDC to pursue legal actions in the name of the state was unconstitutional. Before that decision was rendered, however, the district court allowed the CDC to participate as amicus curiae but rejected its position that even if the PLRA were unconstitutional, Arizona is entitled to a termination of the decree because it complied in good faith and there was no violation of a constitutional right. That ruling is not before us on appeal.
 
 
 [7]
 In fact, the August 27, 1973 order effectively superseded the December 22, 1972 order, as the later order addressed proposed new rules submitted pursuant to the prior order. The court recognized a number of changes that had taken place within the Department of Corrections, reiterated that "it is neither the duty nor the prerogative of this Court to dictate rules and regulations for the prison," and resolved disputes about a few of the proposed provisions. The court also retained jurisdiction "as indicated in previous orders" solely to consider objections to the appeal procedure as administered, final settlement of good time credits, and consideration of an amendment to the Final Draft rules. All of this occurred before final judgment was entered in October.
 
 
 [8]
 The motion seeks to terminate the "consent decree entered in this case on December 22, 1972, and modified by Order filed February 24, 1994." The February 24, 1994 order is the order that the district court vacated on due process grounds. However, this has no bearing on the viability of Arizona's PLRA motion because the Prisoner Rules, Regulations and Discipline Program that were modified in 1979 and that Arizona sought to modify again in 1994 were approved in the judgment - not the December 22, 1972 order.
 
 
 [9]
 Cf., e.g., Teamsters Joint Council No. 42 v. Int'l Brotherhood of Teamsters, 82 F.3d 303, 307 (9th Cir. 1996) (judgment on the merits moots preliminary injunction); Securities & Exchange Comm'n v. Mount Vernon Mem'l Park, 664 F.2d 1358, 1361-62 (9th Cir. 1982) (applying "long recognized" doctrine that the propriety of preliminary relief merges into a decision on the merits); Madison Square Garden Boxing, Inc. v. Shavers, 562 F.2d 141, 144 (2d Cir. 1977) ("With the entry of the final judgment, the life of the preliminary injunction came to an end, and it no longer had a binding effect on any one.").
 
 
 [10]
 This would also afford the district court an opportunity on remand to consider whether a motion to terminate under 3626(b)(2) should first be construed and considered as a motion under Rule 60(b). If the court were to find, for example, that the October 19, 1973 judgment had been discharged it could relieve Arizona of the final judgment pursuant to Rule 60(b)(5). Or if it were to find that the judgment was indeed a "consent decree with prospective application," but that it would be inequitable to continue giving it prospective effect on account of a significant change in factual conditions or law, it could reopen and revise it under Rufo. Either way, the need to apply the PLRA's "immediate termination" provision might be averted.
 
 
 [11]
 We disagree with the dissent's view that the district court had "continuing supervisory jurisdiction" or that Arizona availed itself of the court's "continuing supervisory jurisdiction" on several occasions. See Dissent at 6563-64 & n.7. The court did not have continuing supervisory jurisdiction because the October 19, 1973 judgment did not state that it was retaining jurisdiction. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381-82, 128 L. Ed. 2d 391, 114 S. Ct. 1673 (1994). Nor did Arizona invoke the court's continuing supervisory jurisdiction in November 1979 or January 1994, but instead filed a routine motion to alter or amend judgment under Rule 60(b). That Arizona chose to ask the court's blessing on revisions to the rules by moving pursuant to Rule 60(b) to modify the judgment, and was successful, is immaterial to the point that it was a final judgment because changing the rules did not require court approval.
 
 
 [12]
 18 U.S.C. 3626(a) (West Supp. 1999), titled "Requirements for relief," provides in relevant part:
 (1) Prospective relief. -
 (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.
 
 
 [13]
 The Court made clear in Rufo that even under Rule 60(b) "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." Rufo, 502 U.S. at 391. Thus, even if the Taylor judgment is a "consent decree" under the PLRA's definition, the congressional directive to terminate it unless it is the minimum necessary to correct a violation goes well beyond the reopening possibilities that the parties could reasonably have expected in 1973. As such, the PLRA definition of a "consent decree" would itself be impermissibly applied retroactively if its effect were to make the Taylor judgment anything other than a final judgment "that may be reopened only to the extent that equity requires" pursuant to Rule 60(b) under Rufo. Id.; see also Stone v. City and County of San Francisco, 968 F.2d 850, 854 (9th Cir. 1992) (a consent decree is a final judgment even if the district court retains jurisdiction over the case).
 
 
 [14]
 18 U.S.C. 3626(b) (West Supp. 1999) provides in pertinent part:
 (2) Immediate termination of prospective relief. - In any civil action with respect to prison conditions, a defendant or intervenor shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.
 (3) Limitation. - Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation. (Emphasis added.)
 
 
 TASHIMA, Circuit Judge, concurring in part:
 
 34
 I concur in Parts I and II.A, and in the judgment. As the analysis in Part II.A is sufficient completely to dispose of this appeal, I view Part II.B as unnecessary dicta and decline to reach the issue of the constitutionality of the Prison Litigation Reform Act of 1995 in this case.
 
 
 35
 WARDLAW, Circuit Judge, with whom THOMPSON, KLEINFELD, SILVERMAN, and GRABER, Circuit Judges, join, dissenting:
 
 
 36
 In Taylor v. United States, 143 F.3d 1178, 1185 (9th Cir. 1998), a three-judge panel of this court affirmed the district court's invalidation of the termination provision of the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 802, 110 Stat. 1321-65 (1996) (codified as 18 U.S.C.A. 3626(b)(2)) (West Supp. 1999) ("PLRA" or the "Act"). We took this case en banc to consider whether Taylor would remain the law of the circuit. My colleagues affirm, albeit on different grounds than the now-vacated panel decision. Specifically, the majority "affirms the denial of the motion to terminate the December 22, 1972 consent decree on the ground that it was moot." Ante, 181 F.3d 1017. In so holding, the majority today firmly entrenches the Ninth Circuit outside the judicial mainstream of PLRA interpretation. Worse, it effectively precludes Congress from limiting prospectively a discrete kind of federal district court expropriation of power from democratically-elected state governments.
 
 
 37
 The majority holding is precariously perched upon a mischaracterization of the "judgment" at issue, the consequences of which are nothing short of extraordinary. Indeed, under the approach espoused by the majority, consent decrees plainly providing prospective relief, but fortuitously labeled as "judgments" by district courts in this circuit remain forever beyond the reach of the PLRA's termination provision. Thus, when prison officials in the State of Arizona wish to alter such correctional niceties as the duration of inmate showers or library privileges, they must continue to seek the permission of a federal district judge in Phoenix, a practice they have endured for the past quarter century. As discussed infra, in reaching to avoid the constitutional questions before us today, the majority effectively has rendered the Act a historical nonoccurrence, at least in the Ninth Circuit. I cannot let such a ruling stand without dissent, and respectfully offer mine.
 
 
 38
 * When Congress enacted the PLRA, it sought to oust the federal judiciary from day-to-day prison management.[1] To that end, the PLRA authorizes prison officials to return to district court for the immediate termination of prospective relief under existing district court consent decrees. Specifically, the Act entitles defendants in prison-condition lawsuits to:
 
 
 39
 immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.
 
 
 40
 18 U.S.C.A. 3626(b)(2) (the "termination provision").[2] The supervising tribunal may refuse to terminate jurisdiction only if it makes written findings "that prospective relief remains necessary to correct a current or ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C.A. 3626(b)(3) (the "prospective relief provision").[3]
 
 
 41
 Although several district court judges have sustained inmates' constitutional challenges to the PLRA,[4] every federal appellate court to consider the question, other than this one, has upheld the constitutionality of the Act. See Benjamin v. Jacobson, 172 F.3d 144, 1999 188240, at *21 (2d Cir. 1999) (en banc) (holding that section 3626(b)(2) does not violate separation-of-powers principles); Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 188 (3d Cir. 1999) (same); Hadix v. Johnson, 133 F.3d 940, 942-43 (6th Cir.) (same), cert. denied, 524 U.S. 952, 118 S. Ct. 2368, 141 L. Ed. 2d 737 (1998); Dougan v. Singletary, 129 F.3d 1424, 1426 (11th Cir. 1997) (same), cert. denied, 524 U.S. 956, 118 S. Ct. 2375, 141 L. Ed. 2d 743 (1998); Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 657-58 (1st Cir. 1997) (same), cert. denied, 524 U.S. 951, 118 S. Ct. 2366, 141 L. Ed. 2d 735 (1998); Gavin v. Branstad, 122 F.3d 1081, 1088-89 (8th Cir. 1997) (same), cert. denied, 524 U.S. 955, 118 S. Ct. 2374, 141 L. Ed. 2d 741 (1998); Plyler v. Moore, 100 F.3d 365, 371-72 (4th Cir. 1996) (same), cert. denied, 520 U.S. 1277, 117 S. Ct. 2460, 138 L. Ed. 2d 217 (1997). Indeed, the Sixth Circuit's decision in Hadix overturned the last of the recalcitrant district courts and momentarily harmonized federal law. Five months after Hadix, this court issued its now-vacated opinion in Taylor.
 
 
 42
 Although, as the majority correctly points out, the prison officials in the instant case moved to terminate the district court's December 22, 1972, order, that stipulated order was embodied in the district court's subsequent judgment of October 19, 1973. The October 19, 1973, "judgment" accomplished two things. First, it adopted and expressly incorporated the stipulated rules and regulations that would govern the Arizona State Prison in Florence, Arizona. Second, it provided prospective and ongoing relief in that the rules and regulations demanded compliance by the prison officials unless they returned to the district court to obtain modification. Because the majority opinion operates under the faulty premise that the relief embodied in the December 22, 1972, order "disappeared when the final judgment was entered on October 19, 1973," ante at 1018, I now recount the procedural background of this case in some detail to clarify the matter.
 
 
 43
 Like the litigation that passed before our sister circuits, this controversy originated with a class action brought under 42 U.S.C. 1983 against a correctional institution. Inmates of the Arizona State Prison System (collectively, "the plaintiffs") filed complaints in 1972 against various state prison officials, alleging unconstitutional conditions of confinement. The consolidated amended complaint averred that the State of Arizona and individual defendants' predecessors in office (collectively, "the defendants") had violated the First, Eighth, and Fourteenth Amendments by adopting and enforcing unconstitutional disciplinary rules, denying prisoners procedural due process, unlawfully depriving prisoners of good time credits, and subjecting prisoners who were placed in isolation to inadequate diets and degrading living conditions. During the first of two evidentiary hearings, the parties stipulated that "the disciplinary procedures of the prison leave something to be desired to comply with constitutional standards" and agreed "to negotiate over proper disciplinary standards and procedures to the end of seeking agreement." Negotiations ensued, and after another evidentiary hearing, the defendants entered into an agreement with the plaintiffs. The agreement called for the defendants to adopt new rules of discipline and to restore good-time credits. The State did not admit liability.
 
 
 44
 The parties' stipulated agreement is encompassed in the district court's order of December 22, 1972. The agreement substantially bridged the divide that had separated the parties but left some disputed issues unresolved. The parties' agreement was not finalized until several months later when, on October 19, 1973, the district court ultimately adopted the finalized version of the rules and regulations that would govern the Arizona State Prison.
 
 
 45
 In the December 22, 1972, order, the district court emphasized in a prefatory paragraph that, "because of agreements of counsel which prevented a full trial of all issues, findings of fact and conclusions of law are not appropriate." The court noted that "all the provisions of the following order were agreed upon by counsel for both sides." The court, "pursuant to the stipulation and request of counsel," then ruled on both the substantive and procedural rules of the prison. As to the substantive rules, the court ordered:
 
 
 46
 1. The defendants, in consultation with counsel for the plaintiffs, shall prepare and submit revised rules.
 
 
 47
 2. This submission shall be made within ninety (90)[5] days of this order.
 
 
 48
 3. The plaintiffs shall present exceptions, if any there be, to the proposed rules within thirty (30) days thereafter, or shall waive exceptions.
 
 
 49
 4. This Court will then adjudicate any appropriate issues, and will declare the resultant rules as generally suitable for use and application until changed.
 
 
 50
 As to the procedural rules, the December 22, 1972, order reflected the parties' accord on such divergent matters as inmate library privileges, exercise schedules, duration of showers, and entitlement to private counsel during disciplinary proceedings. The court stated that it retained jurisdiction for six months "to review the operation of the appeal system [Paragraph II.F.5]" and "to review [the stipulated disciplinary] procedure . . . to determine that it is operating properly [Paragraph II.D.5]." The court "indicated no opinion as to the constitutionality" of these agreed-upon rules.
 
 
 51
 On July 25, 1973, the parties neared final consummation of their agreement. The defendants submitted to the district court a proposed final draft of the "Prisoner Rules, Regulations and Discipline Program of the Arizona State Prison." The plaintiffs simultaneously filed objections to specific provisions of the proposed rules. The proposed final draft stated that the rules had been developed "in an effort to promote an orderly day to day operation of this Prison and to maintain the health, safety, security, and general welfare of the prisoners, the staff and others while carrying out these functions." The penultimate sentence of the proposed rules stated that "the provisions herein are to take effect immediately upon final approval of the United States District Court for the District of Arizona."
 
 
 52
 Final approval came on October 19, 1973, in the form of a "Judgment" from the district court. Unlike the majority, however, I attach no constitutional or jurisdictional import to the fact that the district court labeled its October 19, 1973, order as a "Judgment." This judgment was a consent decree, that is, "[a] judgment entered by consent of the parties whereby the defendant agrees to stop alleged illegal activity without admitting guilt or wrongdoing." Black's Law Dictionary 410 (6th ed. 1990) (defining a consent decree).[6] Moreover, the judgment falls squarely within the PLRA's definition of a consent decree because it "is based in whole or in part upon the consent or acquiescence of the parties." 18 U.S.C.A. 3626(g)(1). The judgment expressly adopted the stipulated rules and regulations of the Arizona State Prison system, ordering:
 
 
 53
 That the Prisoner Rules, Regulations and Discipline Program of the Arizona State Prison attached to this Judgment as Exhibit No. I and incorporated by reference are approved, the procedural rules and requirements to be effective immediately, the substantive rules to be effective within a reasonable time to allow for printing in booklet form, presentation to the inmate population and sufficient opportunity for inmates to become acquainted with the violations set out.
 
 
 54
 Perhaps most importantly for purposes of this litigation, the relief embodied in the prison rules and regulations constitutes "prospective relief" under the meaning of that term as provided by the PLRA. See 18 U.S.C.A. 3626(g)(7). The district court's judgment recited that the "court having heard arguments, considered pleadings and stipulations, does now order and adjudge . . . ." (emphasis added). The "judgment" dictated the prospective governance of the prison by ordering the Arizona State Prison to comply with the stipulated Prisoner Rules, Regulations and Discipline Program "effective immediately" with respect to procedural rules and "within a reasonable time" with respect to substantive rules. Neither it, nor any other order of the court, vacated the previously entered orders requiring compliance with aspects of the now final rules.
 
 
 55
 The judgment summarily brought an end to months of negotiation and compromise between the parties. The district court ruled in favor of the plaintiffs and stated "that all relief sought by plaintiff members of the class heretofore designated to which they are entitled is granted by this Judgment and that the class, collectively and individually, is entitled to no other relief under this action." The judgment defined the class to include "all inmates who were and are serving sentences at the Arizona State Prison during the pendency of this action."
 
 
 56
 The parties and the district court clearly understood the prospective and mandatory nature of the relief embodied in the prison rules and regulations as adopted by the district court. In the twenty-three years between entry of the October 19, 1973, judgment and the enactment of the PLRA, the defendants availed themselves of the continuing supervisory jurisdiction[7] of the district court on several occasions. In 1979, the defendants proposed new disciplinary rules and regulations and moved to modify the October 19, 1973, judgment pursuant to Federal Rule of Civil Procedure 60(b). That the defendants returned to district court to seek amendments to the prison rules and regulations comes as no surprise, as they clearly understood that they were fulfilling their legal obligations pursuant to a stipulated agreement under the threat of contempt.[8]
 
 
 57
 On February 11, 1980, the defendants filed a "Reply to Response to Motion to Modify" which incorporated a number of modifications to the proposed rules and regulations "to meet objections raised by counsel for plaintiff class." On March 6, 1980, the district court approved the proposed rules as modified by the February 11, 1980, submission, writing:
 
 
 58
 It was never intended that the 1973 rules be set in concrete. In view of changing State Prison conditions, a completely reorganized and staffed Department of Corrections, and the developing law in the area of prisoner civil rights, it is not surprising that after almost seven years changes in the rules and regulations should be proposed. The Court has reviewed the proposed rules as modified by defendants' February 11, 1980 pleadings and finds that on their face they meet minimal constitutional standards.[9] In view of this Court's past experience, it is clear that prison inmates will not hesitate to bring to the Court's attention any claimed unconstitutional application of the rules. It is appropriate to here express this Court's appreciation to John P. Frank and his associates of the law firm of Lewis and Roca for their energetic pro bono representation of the plaintiff class. They worked diligently and effectively with defense counsel to protect the interests of their clients. Even though they oppose approval of the new rules as modified, that opposition does not appear to be based on a constitutional question. The Court is grateful for their assistance.
 
 
 59
 In 1994, the defendants again requested modification of the prison rules due to changes in the law and unanticipated factual circumstances. The district court granted the defendants' motion for modification by an order entered February 24, 1994. On January 18, 1995, two inmates - not previously named as parties - filed a motion to vacate the order, alleging that they had not received notice of the motion to modify the consent decree.
 
 
 60
 This last motion instigated a series of procedural problems that, for purposes of this appeal, lost their significance when the defendants moved pursuant to the recently-enacted PLRA "to terminate the consent decree entered in this case on December 22, 1972." The district court granted the defendants' motion to terminate but stayed that order pending a determination of whether the termination provision passed constitutional muster. In an interlocutory order issued March 21, 1997, the district court concluded that the termination provision violated the principle of separation of powers. The district court then vacated the February 24, 1994 order, but stayed the vacation order to resolve the motion to modify the December 22, 1972, consent decree.
 
 
 61
 The defendants and the United States of America, which intervened pursuant to 28 U.S.C. 2403(a) to defend the PLRA's constitutionality, timely appealed from the interlocutory order of March 21, 1997. The three-judge panel affirmed the district court's invalidation of the PLRA. See Taylor, 143 F.3d at 1179. A majority of active judges voted to rehear the case en banc because the constitutional question presented touches upon a matter of considerable and nationwide public concern. See Taylor v. United States, 158 F.3d 1059 9th Cir. 1998). This court has jurisdiction under 28 U.S.C. 1292(a)(1), and I would reverse the district court's order.
 
 II
 
 62
 I am mindful of the rudimentary principle "that constitutional issues not be needlessly confronted," Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council, 485 U.S. 568, 575, 108 S. Ct. 1392, 1397, 99 L. Ed. 2d 645 (1988), but I am aware of no authority that would compel this court to construe a record "to the point of disingenuous evasion." United States v. Locke, 471 U.S. 84, 96, 105 S. Ct. 1785, 1793, 85 L. Ed. 2d 64 (1985) (quoting George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S. Ct. 620, 622, 77 L. Ed. 1265 (1933)). The majority suggests that "the motion that is before us - 'to terminate the consent decree entered in this case on December 22, 1972' - is moot because the December 22, 1972 order (regardless of its label) was interlocutory and disappeared when the final judgment was entered October 19, 1973." Ante at 1018. The October 19, 1973, judgment, according to the majority, "could not be more final" as "it does not look, walk or quack like an injunction." I see the matter differently.
 
 
 63
 Here, the critical procedural question is not whether the October 19, 1973, judgment is an injunction, but whether the judgment fits within the PLRA's definition of a "civil action with respect to prison conditions in which prospective relief is ordered." 18 U.S.C.A. 3626(b)(1). The record in this case resoundingly answers this question in the affirmative.
 
 
 64
 I begin by noting my agreement with the majority's assertion that the October 19, 1973, judgment was not an injunction. Although the majority seems to vacillate on this issue, see ante, at 1022 n. 9, the October 19, 1973, judgment clearly was not an injunction; it was a judgment by consent, entered by sanction and order of the district court. Although they bear some of the earmarks of injunctions,[10] consent decrees do not involve a decision on the merits.[11] As we explained in Gates v. Shinn, 98 F.3d 463, 468 (9th Cir. 1996):
 
 
 65
 Consent decrees differ from contested injunctions in that, instead of being won in contested litigation, they are issued by the court pursuant to an agreement of the parties. A consent decree is therefore in some respects contractual in nature, but the equitable decree based on the agreement is subject to the rules generally applicable to other judgments and decrees.
 
 
 66
 (citation and internal quotation omitted). In light of these principles, I am unable to endorse the reasoning advanced by the majority that the agreement embodied in the December 22, 1972, order was not part of the relief that was granted in the October 19, 1973, judgment. For purposes of the PLRA, it was the relief that was granted. See Imprisoned Citizens Union, 169 F.3d at 189 (explaining that the PLRA "broadly defines 'prospective relief' as including 'all relief other than compensatory monetary damages'") (quoting 18 U.S.C. 3626(g)(7)); see also Benjamin, 172 F.3d 144, 156-57 (noting that the PLRA broadly defines "[a] consent decree . . . as relief entered by the court, and it is well established that a federal court ordinarily has the power to enforce its own orders and judgment") (citations and internal quotation marks omitted). Thus, the majority's suggestion that the defendants should have moved to terminate the October 19, 1973, judgment rather than the December 22, 1972, order, is highly technical and, ultimately, immaterial because the October 19, 1973, judgment expressly adopted the stipulated prison rules and regulations as contemplated in the December 22, 1972, order.[12] Moreover, "it is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities." United States v. M. Cutter Co., 130 F.3d 440, 441 (9th Cir. 1997) (quoting Foman v. Davis, 371 U.S. 178, 181, 83 S. Ct. 227, 228, 9 L. Ed. 2d 222 (1962)).
 
 
 67
 Consent decrees are jurisprudentially anomalous in that they reflect the attributes of a contract and a judicial act. See Firefighters, 478 U.S. at 519, 106 S. Ct. at 3073. "Though a consent decree has judicial features, it is 'the parties' consent [that] animates the legal force of a consent decree.'" Sumner, 994 F.2d 1401 at 1406 (quoting Firefighters, 478 U.S. 501 at 525, 106 S. Ct. 3063 at 3077, 92 L. Ed. 2d 405). Thus, the supervising tribunal must enforce a consent decree in accordance with the intent of the parties, see System Fed'n No. 91, 364 U.S. at, 647, 81 S. Ct. at 371, and, in doing so, the court maintains authority to modify or interpret such decrees in light of changed circumstances. See id. at 646-47, 81 S. Ct. at 370-71; see also In re Pearson, 990 F.2d 653, 657 (1st Cir. 1993) (explaining that the authority to modify a consent judgment "is part of a court's inherent powers and exists regardless of whether a particular consent decree expressly so provides").
 
 
 68
 Here, the parties voluntarily terminated a law suit by assenting to the terms specified in the stipulated prison rules and regulations, a negotiated agreement that a federal district court judge in Phoenix, Arizona agreed to enforce as a judgment. The record in this case amply demonstrates that the parties desired and expected that the prison rules and regulations would be reflected in and enforceable as a judicial decree prospectively until such time as the rules were modified or terminated by the district court. Accordingly, I respectfully must disagree with the majority's assertion that the October 19, 1973, judgment "left nothing more for the district court to do." Ante, at 1023. Like the consent decrees at issue in Benjamin, Imprisoned Citizens Union, Hadix, Dougan, and Inmates of Suffolk County Jail, Gavin, and Plyler, the October 19, 1973, judgment entered in this case has subjected the defendants to ongoing federal court supervision and enforcement for the past twenty-five years.[13] Indeed, when the districtcourt entered judgment on October 19, 1973, this litigation was far from "over," and it is no answer to say that "changing the rules did not require court approval." Ante, at 1023 n. 11. In seeking the district court's approval, the defendants were doing quite a bit more than "asking the court's blessing." Id. Rather, as previously explained, when they moved to amend the rules, the defendants were fulfilling their legal obligations pursuant to a stipulated agreement under the threat of contempt.
 
 
 69
 Although I am uncertain how a consent decree should look,[14] the October 19, 1973, judgment at issue has neither walked nor quacked like a "final" judgment for the past quarter century. This was just the sort of judgment upon which Congress set its sights when it crafted the PLRA's termination provision. The plaintiffs' challenges to the constitutionality of that provision are live and squarely before us. We should not duck the question.
 
 III
 
 70
 This en banc panel was called upon to consider one question: whether the termination provision contravenes the inviolate constitutional principle of separation of powers. Such questions of law engender de novo review. See Tierney v. Kupers, 128 F.3d 1310, 1311 (9th Cir. 1997).
 
 
 71
 In determining whether Congress has trespassed into the constitutional sphere occupied by Article III courts, our review is not free from constraint. Rather, when examining congressional enactments such as the PLRA for constitutional infirmities, we "give great weight to the decision of Congress." Confederated Tribes of Siletz Indians v. United States, 110 F.3d 688, 693 (9th Cir.) (citation omitted), cert. denied, 522 U.S. 1027, 118 S. Ct. 625, 139 L. Ed. 2d 606 (1997). We ordinarily recognize that when a federal court "is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons." Mistretta v. United States, 488 U.S. 361, 384, 109 S. Ct. 647, 661, 102 L. Ed. 2d 714 (1989) (quoting Bowsher v. Synar, 478 U.S. 714, 736, 106 S. Ct. 3181, 3193, 92 L. Ed. 2d 583 (1986) (Stevens, J., concurring)). Although we may not abdicate our responsibility to strike down constitutionally unsound statutes, this court adheres to a principle of presumptive constitutionality when evaluating the validity of federal statutes. See United States v. Henson, 123 F.3d 1226, 1232 (9th Cir. 1997); see also Philips v. Perry, 106 F.3d 1420, 1425 (9th Cir. 1997) ("A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it. . . .") (quoting Heller v. Doe, 509 U.S. 312, 320-21, 113 S. Ct. 2637, 2643, 125 L. Ed. 2d 257 (1993) (citations and internal quotations omitted)). It is with these principles that I turn to the merits of this case.
 
 IV
 
 72
 I divide the district court's conclusion that the termination provision violates the separation-of-powers doctrine into two lines of inquiry. First, I examine whether the termination provision constitutes a legislative reopening of the final judgments of Article III courts. See Plaut, 514 U.S. at 218, 115 S. Ct. at 1452-53. Second, I analyze whether the termination provision mandates the result in particular cases or controversies, another impermissible legislative encroachment into Article III territory. See United States v. Klein, 80 U.S. (13 Wall.) 128, 146-47, 20 L. Ed. 519 (1871).[15] I address these issues in turn.
 
 
 73
 * The constitutional analysis is circumscribed by three Supreme Court decisions spanning two centuries: Plaut; Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992); and Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) 421, 15 L. Ed. 435 (1855) (Wheeling II). The district court read these cases as requiring the invalidation of the PLRA's termination provision. I read them differently.
 
 
 74
 Plaut involved a Congressional attempt to reverse the effects of the Supreme Court's earlier decision in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991). In Lampf, the Court adopted a uniform national limitations period for civil actions under section 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U.S.C. 78j(b). As a result of the Lampf decision, litigants with pending section 10(b) cases found themselves with untimely claims that were then dismissed on the merits. Several months later, Congress enacted a statute that required courts to reinstate a dismissed section 10(b) action on the motion of a plaintiff if the action would have been considered timely before the Lampf decision. The Plaut Court concluded that this prospective restoration of the old limitations period worked an undue legislative interference with the historic independence of Article III courts "by retroactively commanding the federal courts to reopen final judgments." Plaut, 514 U.S. at 219, 115 S. Ct. at 1453. The Court defined "final judgments" as decisions that represent "the last word of the judicial department with regard to a particular case or controversy." Id. at 227, 115 S. Ct. at 1457.
 
 
 75
 In Rufo, the Court considered the application of finality principles in the context of consent decrees. Rufo involved a county sheriff who sought modification of a consent decree to allow the county jail to bunk two inmates per cell. The district court denied the request, and the First Circuit affirmed, concluding that the consent decree closed the question with finality. The Supreme Court vacated the district court's decision, holding that, "once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." Rufo, 502 U.S. at 391, 112 S. Ct. at 763.
 
 
 76
 Echoing a tactic frequently employed by courts and commentators, the district court in the case before us extracted from the Rufo decision the following quotation: "a consent decree is a final judgment that may be reopened only to the extent that equity requires." Id., 112 S. Ct. at 764. From this quotation, the district court shaped the following deductive scheme: Congress, under Plaut, cannot mandate the reopening of final judgments without offending the principle of separation of powers; a consent decree is a final judgment under Rufo; therefore, Congress cannot mandate the reopening of consent decrees. The syllogism fails. Although I do not quarrel with its major premise, the minor premise cannot withstand scrutiny.
 
 
 77
 The Court in Plaut expressly distinguished the statute before it from "legislation . . . that altered the prospective effect of injunctions entered by Article III courts." Plaut, 514 U.S. at 232, 115 S. Ct. at 1459 (citing Wheeling II, 59 U.S. (18 How.) at 421). Wheeling II is the earliest and most significant of a line of cases that are excepted from the general proscription against legislative interference with the final judgments of Article III courts. Wheeling II was the second incarnation of an original action brought in the Supreme Court by the State of Pennsylvania. The State had sued to enjoin the defendant's bridge as an obstruction of navigation on the Ohio River. In the first stage of the litigation, the Court issued an injunction requiring the defendant to remove or elevate the bridge. See Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 526-27, 14 L. Ed. 249 (1852). After this earlier ruling, Congress passed a statute establishing the bridge as a post road and requiring vessels using the Ohio to avoid interfering with the structure. A storm then destroyed the original bridge, prompting the parties to return to the Court when the bridge company sought to rebuild. Pennsylvania attempted to interpose its original injunction, claiming that Congress lacked constitutional authority to reverse the effects of that injunction through subsequent legislation. The Court disagreed and held that Congress has the power to regulate interstate commerce, which necessarily includes "the power to determine what shall or shall not be deemed in judgment of law an obstruction to navigation." Wheeling II, 59 (18 How.) U.S. at 431.
 
 
 78
 The Wheeling II Court thus established the precept that a forward-looking judgment in equity remains subject to legislative alterations whereas a judgment at law is forever immune to subsequent changes in the law. See Wheeling II, 59 U.S. (18 How.) at 431; see also Landgraf v. USI Film Prods., 511 U.S. 244 at 273, 114 S. Ct. 1483 at 1501, 128 L. Ed. 2d 229 ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."); System Fed'n No. 91, 364 U.S. at 651-52, 81 S. Ct. at 373-74 (holding that the district court abused its discretion by failing to revise an injunction to permit labor practice that had been unlawful at the time consent decree was entered but subsequently had been legalized); Daylo v. Administrator of Veterans' Affairs, 163 U.S. App. D.C. 251, 501 F.2d 811, 818 (D.C. Cir. 1974) (holding that vulnerability to legislative alteration "would seem to depend on the character of the compliance called for"). The Rufo Court itself noted the distinction between "restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative." Rufo, 502 U.S. at 379, 112 S. Ct. at 758 (quoting United States v. Swift & Co., 286 U.S. 106, 114, 52 S. Ct. 460, 462, 76 L. Ed. 999 (1932)).
 
 
 79
 From Wheeling II and its progeny I distill this clear principle: although a consent decree constitutes a final judgment in the sense that it is an appealable order, it is not a final judgment for separation-of-powers analysis because it does not represent "the last word of the judicial department with regard to a particular case or controversy" as set forth in Plaut. 514 U.S. at 227; 115 S. Ct. at 1457. As other circuits have concluded, although a consent decree is a final judgment, it is not the last word of the judicial branch. See, e.g., Dougan, 129 F.3d at 1426. The courts maintain jurisdiction over these judgments, not only to ensure compliance, but also to modify them as future changes in the facts and law may require. See Imprisoned Citizens Union, 169 F.3d at 184, Gavin, 122 F.3d at 1087; Plyler, 100 F.3d at 371.
 
 
 80
 The principle set forth above, of course, undermines the minor premise in the district court's deductive scheme and dismantles the syllogism. It does not answer, however, the more difficult question whether Congress, rather than the judicial department, possesses the constitutional authority to reopen a consent decree "to the extent that equity requires."
 
 
 81
 I recognize that neither Wheeling II nor Plaut is completely instructive on this weighty issue. In Wheeling II, the Court itself decided that it would not enforce its original injunction after the law had been changed by Congress. See Wheeling II, 59 U.S. (18 How.) at 431-32. Congress, however, did not mandate that decision directly. In Plaut, the Court distinguished between a district court's discretionary power to set aside a judgment pursuant to Federal Rule of Civil Procedure 60(b), the procedural mechanism at issue in Rufo, and Congress' attempt to require that a judgment be set aside. See Plaut, 514 U.S. at 233-34, 115 S. Ct. at 1460-61. Notwithstanding those distinctions, the termination provision survives. This is so because the relief at issue is embodied in the idiosyncratic form of a consent decree. See Gavin, 122 F.3d at 1088 ("Our inquiry . . . is whether the consent decree is the 'last word' of the Article III courts in the case, and the existence of Rule 60(b), as construed in Rufo, makes it unlikely that a court's approval of a consent decree constitutes the court's 'last word' on the issue of what relief is appropriate in perpetuity."). I conclude that the termination provision removes only the court's power in the future to enforce previously-ordered equitable relief when prospective relief, as broadly defined by the PLRA, does not remain necessary to correct a current, ongoing violation of a federal right. See Local Number 93, Int'l Assoc. of Firefighters v. City of Cleveland, 478 U.S. 501, 525, 106 S. Ct. 3063, 3077, 92 L. Ed. 2d 405 (1986); Imprisoned Citizens Union, 169 F.3d at 184; see also Gavin, 122 F.3d at 1086 ("Congress may alter the remedial powers of the federal courts so that the courts may not enforce equitable relief previously awarded in pending cases.").[16]
 
 
 82
 My reading of the intersection among Plaut, Rufo, and Rule 60(b) is by no means a novel one, for Congress possesses well-established authority to require a court in equity to make specific findings before issuing injunctive relief. See Lauf v. E.G. Shinner & Co., 303 U.S. 323, 330, 58 S. Ct. 578, 581, 82 L. Ed. 872 (1938) ("There can be no question of the power of Congress thus to define and limit the jurisdiction of the inferior courts of the United States.") (upholding Norris-LaGuardia Act, 29 U.S.C. 101-115 (1994)); 28 U.S.C. 2283 (1994) (Anti-Injunction Act); 28 U.S.C. 1341 (1994) (Tax Injunction Act). That the original supervising tribunal in the case at bar issued the injunctive relief before Congress restricted the court's authority to do so is "of [no] constitutional significance." Gavin, 122 F.3d at 1087; see also Western Union Tel. Co. v. International Bhd. of Elec. Workers, 133 F.2d 955, 958-59 (7th Cir. 1943) (requiring district court to apply Norris-LaGuardia Act to injunction entered eight years before the Act was enacted).
 
 
 83
 As a final matter, I observe that the district court found the Wheeling II line of cases inapposite, narrowly interpreting Wheeling II to stand for the proposition that Congress may interfere with consent decrees only to the extent that the relevant legislation is based on "public rights common to all." Taylor v. Arizona, 972 F. Supp. at 1246 (citing Wheeling II, 59 U.S. (18 How.) at 432-32). I would reject the so-called public rights/private rights distinction in this context. The authority to do so rests in Plaut where the Supreme Court stated that "the doctrine of separation of powers is a structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." Plaut, 514 U.S. at 239, 115 S. Ct. at 1463. In other words, the source of the underlying right is irrelevant to the separation-of-powers inquiry. See Gavin, 122 F.3d at 1088 ("The character of the right involved has nothing to do with the separation-of-powers issue.") (citing Plaut, 514 U.S. at 230, 115 S. Ct. at 1458); see also Imprisoned Citizens Union, 169 F.3d at 186 ("The Wheeling Bridge Court's decision ultimately turned on the nature of the relief, not the source of the right."); cf. Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 853-54, 106 S. Ct. 3245, 3258-59, 92 L. Ed. 2d 675 (1986) (analyzing the public/private rights distinction in the context of Congress' power to assign certain controversies to non-Article III tribunals); Hodges v. Snyder, 261 U.S. 600, 603-04, 43 S. Ct. 435, 436-37, 67 L. Ed. 819 (1923) (analyzing the distinction in the context of due process and vested rights).
 
 
 84
 Moreover, even were I to accept the district court's "public rights" requirement as narrowing the circumstances under which Congress may alter prospective judgments, I still would uphold the termination provision. Recognizing that we must, whenever possible, interpret a statute in a fashion that renders it constitutionally valid, see Communications Workers of Am. v. Beck, 487 U.S. 735, 762, 108 S. Ct. 2641, 2657, 101 L. Ed. 2d 634 (1988), I read the provision as nothing more than a generally applicable change in substantive statutory law. See Imprisoned Citizens Union, 169 F.3d at 186-87 ("Our holding today would be no different if we were to decide that the Wheeling Bridge exception only applies where public rights are at stake. To whatever extent the consent decree embodies private rights, those rights are unaffected by the PLRA."); seegenerally Guido Calabresi, Retroactivity: Paramount Powers and Contractual Changes, 71 Yale L.J. 1191, 1198-99 (1962) (evaluating Congressional enactments that alter the effect of existing contractual obligations of the federal government). Because nothing in the case law convinces me that the source of the legal rule is dispositive, I cannot say that the termination provision amounts to a legislative reopening of a final judgment.
 
 B
 
 85
 I next turn to the question whether the termination provision prescribes a rule of decision in violation of a different aspect of the separation-of-powers principle, first articulated by the Supreme Court in the years following the Civil War. See Klein, 80 U.S. (13 Wall.) at 146-47. The plaintiff in Klein was the administrator of the estate of V.F. Wilson, a Confederate sympathizer. Congress had passed a statute that permitted noncombatant Confederate landowners to recover confiscated goods upon proof of their loyalty to the Union. The administrator brought suit in the Court of Claims pursuant to this statute, attempting to recover proceeds from the sale of Wilson's previously confiscated cotton. To that end, the administrator tendered evidence that Wilson had received a presidential pardon, mindful that the Supreme Court earlier had held that such a pardon was conclusive proof of loyalty. See United States v. Padelford, 76 U.S. (9 Wall.) 531, 19 L. Ed. 788 (1869). The Court of Claims ruled in favor of the administrator, but as his claim was on appeal to the Supreme Court, Congress passed a statute which declared that a presidential pardon actually proved disloyalty. Accordingly, the new statute directed the judiciary to dismiss any pending recovery actions brought on behalf of a pardon recipient. See Klein, 80 U.S. (13 Wall.) at 131-34.
 
 
 86
 When the government moved the Supreme Court to dismiss the administrator's case, the Court struck down the statute. See id. at 148. It held that the new statute "passed the limit which separates the legislative from the judicial power" by requiring the trial court "to ascertain the existence of certain facts and thereupon to declare that its jurisdiction on appeal has ceased, by dismissing the bill." Id. at 146. By forcing courts to discount the legal or evidentiary effect of a presidential pardon, Congress had "prescribed a rule for the decision for a cause in a particular way." Id. In reaching its holding, the Klein Court distinguished Wheeling II as an instance in which "the court was left to apply its ordinary rules to the new circumstances created by the act [whereas in Klein] no new circumstances have been created by the act." Id. at 147.
 
 
 87
 Although the Supreme Court has not delineated "the precise scope of Klein . . ., later decisions have made clear that its prohibition does not take hold when Congress 'amends applicable law.'" Plaut, 514 U.S. at 218, 115 S. Ct. at 1452 (quoting Robertson v. Seattle Audubon Society, 503 U.S. 429, 441, 112 S. Ct. 1407, 1414, 118 L. Ed. 2d 73 (1992)); see also Axel Johnson Inc. v. Arthur Andersen & Co., 6 F.3d 78, 81 (2d Cir. 1993) ("Klein does not preclude Congress from changing the law applicable to pending cases.") (citations omitted). "Thus, if a statute 'compels changes in the law, not findings or results under old law,' it merely amends the underlying law, and is therefore not subject to a Klein challenge." Imprisoned Citizens Union, 169 F.3d 178 at 187 (quoting Robertson, 503 U.S. at 438, 112 S. Ct. at 1413).
 
 
 88
 In resolving whether the termination provision impermissibly prescribes a rule of decision, I conclude that the termination provision falls more neatly under the Wheeling II paradigm. When the termination provision is read conjunctively with the prospective relief provision, the result is a rather narrow limitation that preserves the need for judicial decision-making. Under the PLRA, a district court now must determine (i) whether there is a current and ongoing violation of a federal right and (ii) whether prospective relief remains necessary to correct such a violation. See 18 U.S.C.A. 3626(b)(3). If the court answers both questions in the affirmative, it must then determine what type of prospective relief furnishes the least intrusive means to correct the violation. See id. 3626(a)(1)(A), (b)(2), (b)(3). Only after resolving the first two questions may the court determine whether prospective relief terminates, or, instead, if prospective relief still must be fashioned to fit the failing found. In view of this scheme, it cannot be said that the termination provision leaves a district court with "no adjudicatory function to perform." United States v. Sioux Nation of Indians, 448 U.S. 371, 392, 100 S. Ct. 2716, 2729, 65 L. Ed. 2d 844 (1980). Rather, the PLRA "has left the judicial functions of interpreting the law and applying the law to the facts entirely in the hands of the courts." Gavin, 122 F.3d at 1089; accord Hadix, 133 F.3d at 943 ("The interpretation and application of law to fact and the ultimate resolution of prison condition cases remain at all times with the judiciary.").
 
 
 89
 Under the PLRA, courts remain free to interpret the law in prison conditions litigation and to apply the law to the facts as the court discerns them. Stated more simply, the termination provision lets judges be judges. For this reason, the PLRA does not run afoul of the Klein doctrine.
 
 V
 
 90
 The simple labeling of the consent decree at issue as a "judgment" did not eradicate the district court's continuing supervisory power over the management of the Arizona State Prison System. That decree was hardly the "last word of the judicial branch" as to the rules the prison officials abided by, subject to contempt of court. Therefore, we were required in this case to determine whether through the PLRA, Congress is empowered to require the district court to cease his management of the prison system, unless he makes the findings required by the PLRA. Supreme Court precedent, the inherently impermanent nature of relief obtained through consent decrees, and the presumptive cloak of constitutionality adorning federal statutes convince me that the enactment of the termination provision was well-within Congressional power and did not encroach into the powers traditionally reserved for Article III tribunals.
 
 
 
 NOTES:
 
 
 [1]
 Although this court ordinarily essays legislative history with a skeptical eye, see Leisnoi, Inc. v. Stratman, 154 F.3d 1062, 1070 (9th Cir. 1998); see also Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S. Ct. 1562, 1567, 123 L. Ed. 2d 229 (1993) (Scalia, J., concurring) (analogizing the use of legislative history to the act of entering a crowded cocktail party and looking over the heads of the guests for one's friends), Congress left no doubts about its intentions when it passed the PLRA. See, e.g., 141 Cong. Rec. S14,419 (1995) (statement of Sen. Abraham) ("No longer will prison administration be turned over to Federal judges for the indefinite future for the slightest reason."); id. at S14,418 (statement of Sen. Hatch) ("I believe that the courts have gone too far in micromanaging our Nation's prisons."); see also H.R. Conf. Rep. No. 104-378 at 166 (1995) (noting that by virtue of the PLRA, "prior consent decrees are made terminable upon the motion of either party, and can be continued only if the court finds that the imposed relief is necessary to correct the violation of the federal right").
 
 
 [2]
 The definitional section of the PLRA provides, in pertinent part:
 (1) the term "consent decree" means any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties . . . (7) the term "prospective relief" means all relief other than compensatory monetary damages . . . (9) the term "relief" means all relief in any form that may be granted or approved by the court, and includes consent decrees . . .
 18 U.S.C.A. 3626(g).
 
 
 [3]
 The phrase "current or ongoing violation" was amended to provide "current and ongoing violation." Department of Justice Appropriations Act, 1998, Pub. L. No. 105-119, 123(a)(2), 11 Stat. 2440, 2470 (1997). The amendment applies to pending cases but has no relevance for purposes of this appeal.
 
 
 [4]
 These courts uniformly invalidated the PLRA on separation-of-powers grounds. See, e.g., Glover v. Johnson, 957 F. Supp. 110, 112 (E.D. Mich. 1997); Hadix v. Johnson, 947 F. Supp. 1100, 1112 (E.D. Mich. 1996); Gavin v. Ray, No. 4-78- CV70026, 1996 WL 622556, at *4 (S.D. Iowa Sept. 18, 1996).
 
 
 [5]
 The court later extended this deadline to July 25, 1973.
 
 
 [6]
 "A consent decree is, by definition, based on an agreement between the parties, not on the judgment of a court, and thus the stage of litigation at which the decree is entered makes no difference." Owen M. Fiss, Justice Chicago Style, 1987 U. Chi. Legal F. 1, 12-13. I hasten to add that, "with the procedural merger of law and equity in the federal and most state courts under the Rules of Civil Procedure, the term 'judgment' has generally replaced 'decree.'" Black's Law Dictionary 410 (6th ed. 1990). The inquiry, as discussed infra, must focus on whether the October 19, 1973, judgment constituted "the last word of the judicial department with regard to a particular case or controversy." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 227, 115 S. Ct. 1447, 1457, 131 L. Ed. 2d 328 (1995).
 
 
 [7]
 "A district court retains jurisdiction to enforce its judgments, including consent decrees." Hook v. Arizona, Dep't of Corrections, 972 F.2d 1012, 1014 (9th Cir. 1992) (citing City of Las Vegas v. Clark County, 755 F.2d 697, 701 (9th Cir. 1985)); see also Stone v. City and County of San Francisco, 968 F.2d 850, 854 (9th Cir. 1992) ("A consent decree is considered a final judgment despite the fact that the district court retains jurisdiction over the case.") (citations omitted).
 
 
 [8]
 See SEC v. Randolph, 736 F.2d 525, 528 (9th Cir. 1984) ("A consent decree is a judgment, has the force of res judicata, and it may be enforced by judicial sanctions, including . . . citations for contempt."); see also Frank H. Easterbrook, Justice and Contract in Consent Judgments, 1987 U. Chi. Legal F. 19, 20 (noting that parties to a consent judgment can enforce the terms of their agreement without filing a new suit).
 
 
 [9]
 Earlier in the district court's March 6, 1980, Memorandum and Order, the court described its supervisory role as follows:
 It is recognized that it is neither the duty nor the prerogative of this court to dictate rules and regulations for the prison. The Court's responsibility is only to insure that the disciplinary rules on their face and as applied provide minimal due process as required by the Constitution and that their provisions do not violate the constitutional prohibition against cruel and unusual punishment.
 
 
 [10]
 See, e.g., System Fed'n No. 91 v. Wright, 364 U.S. 642, 647, 81 S. Ct. 368, 371, 5 L. Ed. 2d 349 (1961); see also Smith v. Sumner, 994 F.2d 1401, 1406 (9th Cir. 1993) (noting that a consent judgment "can limit the exercise of official discretion in the same manner as a prison regulation"); William W. Schwarzer, A. Wallace Tashima, James M. Wagstaffe, Federal Civil Procedure Before Trial 15:139:25, at 15-32.2 (1998) ("A consent decree is no more than a settlement that contains an injunction.").
 
 
 [11]
 See United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1990) (explaining that a consent decree is "not a decision on the merits or the achievement of the optimal outcome for all parties, but [is] the product of negotiation and compromise") (quoting United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S. Ct. 1752, 1757, 29 L. Ed. 2d 256 (1971)); see also Thomas M. Mengler, Consent Decree Paradigms: Models Without Meaning, 29 B.C. L. Rev. 291, 322 (1988) (explaining that a "district court, in approving a consent decree, is not remedying a wrong. Except in rare instances, neither party has admitted liability. Because there is no wrongful conduct to remedy, deciding whether the consent decree provisions are 'adequate' in serving the purposes of the law underlying the complaint is literally nonsensical."); 18 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure 4443, at 383 (1981) (noting that consent decrees "entered upon settlement by the parties may assume forms that range from simple orders of dismissal with or without prejudice to detailed decrees.").
 
 
 [12]
 I also note that, in general, consent decrees most certainly do not "merge" into judgments or "disappear." See, e.g., Local Number 93, Int'l Assoc. of Firefighters v. City of Cleveland, 478 U.S. 501, 523-24 n.13, 106 S. Ct. 3063, 3076 n.13, 92 L. Ed. 2d 405 (1986) (explaining that a consent decree continues jurisdiction in a single court (the issuing court), thereby facilitating enforcement through the court's contempt powers); In re Pearson, 990 F.2d 653 at 657 ("The entry of a consent decree does not 'kill' a case or terminate a district court's jurisdiction.").
 
 
 [13]
 The majority, citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381-82, 114 S. Ct. 1673, 1677, 128 L. Ed. 2d 391 (1994), opines that "the [district] court did not have continuing supervisory jurisdiction because the October 19, 1973 judgment did not state that it was retaining jurisdiction." Ante, at 1023-24 n. 11. Contrary to its characterization by the majority, Kokkonen held that a district court does not have inherent power to enforce terms of a settlement agreement under the doctrine of ancillary jurisdiction where the court previously had dismissed the case pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii). See 511 U.S. at 381-82, 114 S. Ct. at 1677. Unlike the October 19, 1973, judgment at issue before us, the district court in Kokkonen did not adopt the parties' settlement as part of the judgment. See id. at 377, 114 S. Ct. at 1675. Moreover, a closer inspection of Kokkonen reveals that the Court explicitly set forth two exceptions where ancillary jurisdiction is always proper: "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent . . . and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Id. at 379-80, 114 S. Ct. at 1666 (emphasis added) (citations omitted). The latter is exactly what the district court did here. The October 19, 1973, judgment expressly adopted the terms of the prison rules and regulations, and the district court has continued to vindicate its authority and effectuate that decree for the past twenty-five years.
 
 
 [14]
 The "looks" of a consent decree have befuddled federal judges for some time. See Firefighters, 478 U.S. at 523, 106 S. Ct. at 3075-76 (noting that although "a consent decree looks like a judgment entered after trial, . . . the mere existence of an unexercised power to modify the obligations contained in a consent decree does not alter the fact that those obligations were created by agreement of the parties rather than imposed by the court"); McGourkey v. Toledo & O.C. Ry. Co. et al., 146 U.S. 536, 544-45, 13 S. Ct. 170, 172, 36 L. Ed. 1079 (1892) ("Probably no question of equity practice has been the subject of more frequent discussion in this court than the finality of decrees."). I note that before we took this case en banc, two federal district judges and a unanimous panel of this court believed that the relief at issue in this case looked like the type of relief typically encompassed within a consent decree. See Taylor v. United States, 143 F.3d at 1179; Taylor v. Arizona, 972 F. Supp. 1239, 1241-42 (D. Ariz. 1997).
 The divorce decree, which may be the most common type of consent decree, operates exactly like the one here: it is a final appealable judgment, provides no other relief to the parties, but often adopts rules governing the parties' future conduct, such as child or spousal support payments or custodial or visitation rights.
 
 
 [15]
 The district court did not address the defendants' arguments on this second question. We have discretion in deciding whether to rule on this issue, see Singleton v. Wulff, 428 U.S. 106, 121, 96 S. Ct. 2868, 2877-79, 49 L. Ed. 2d 826 (1976); Nelson v. City of Irvine, 143 F.3d 1196 at 1205-06, and I now exercise that discretion. I do so because the Klein doctrine is simply another aspect of the separation-of-powers principle.
 
 
 [16]
 The plaintiffs rely on another factual distinction between Wheeling II and the consent decree in this case. Specifically, the plaintiffs correctly observe that the right underlying the injunction in Wheeling II was a right "under the regulation of Congress," see Wheeling II, 59 U.S. (18 How.) at 431, whereas the right underlying consent decrees in prison conditions litigation is a constitutional right, namely, the Eighth Amendment. That distinction, however, cannot bear the weight the plaintiffs place upon it for two reasons. First, as noted above, Congress has not amended the constitutional law on which the plaintiffs' original cause of action was based. Cf. City of Boerne v. Flores, 521 U.S. 507, 524, 117 S. Ct. 2157, 2166, 138 L. Ed. 2d 624 ("The power to interpret the Constitution in a case or controversy remains in the Judiciary."). Rather, it has limited the power of federal courts to enforce relief greater than that required by the Eighth Amendment. Second, the Wheeling II Court did not premise Congress' ability to alter the prospective effects of the injunction on the necessary condition that the right underlying the injunction be "under the regulation of Congress." Although I agree that Wheeling II may be read as positing this as a sufficient condition, nothing in the opinion suggests that Congress lacks authority to alter prospective effects when the underlying right is constitutional.
 
 
 
 91
 GRABER, Circuit Judge, with whom KLEINFELD and WARDLAW, Circuit Judges, join, dissenting:
 
 
 92
 I dissent. I join the dissenting opinion of Judge Wardlaw, because (1) the "judgment" in this case embodies prospective relief - as the district court and the parties well understood over the years - making the constitutional question ripe for decision, and (2) the termination provision of the Prison Litigation Reform Act of 1995, 18 U.S.C. 3626(b)(2), is constitutional in limiting prospective relief. I write separately to address an additional flaw in Judge Rymer's analysis: her inclusion of Part II(B).
 
 
 93
 When a majority opinion holds, as this one does, that our court lacks a proper opportunity to decide a legal issue that the parties attempt to present, a dissenter has two choices. She can limit her disagreement to the question of our court's authority, or she can go on to describe how she would resolve the substantive issue that, in her view, the court has authority to decide. The dissenter's choice of the latter style grants no license to the author of the majority opinion to include dictum on the substantive issue. Such dictum dilutes the message that the bench and bar should be receiving: that the substantive issue remains unresolved as a matter of law.